In the Matter of the CITY OF NEW YORK, Appellant-Respondent, Relative to Acquiring Title to Real Property Required for LINCOLN SQUARE SLUM CLEARANCE PROJECT Within the Area Bounded by West 60th Street and Other Streets in the Borough of Manhattan. JOHN F. MAXWELL et al., Appellants; CHARLES W. HAND et al., Respondents; 167 WEST 60TH STREET, INC., et al., Respondents-Appellants.

First Department, December 21, 1961.

154

*Irving Genn* of counsel (*Seymour B. Quel* with him on the brief; *Leo A. Larkin, Corporation Counsel,* attorney), for appellant City of New York on residential parcels.

*Milton H. Harris* and *Irving Genn* of counsel (*Seymour B. Quel* on the brief; *Leo A. Larkin, Corporation Counsel,* attorney), for appellant City of New York on commercial parcels.

*Bernard L. Bermant* of counsel (*Carl J. Moskowitz* with him on the brief; *Skinner & Bermant, Leddy & Raber,* attorneys), for claimants-appellants on Damage Parcels 1, 27, 39, 42, 194, 211, 226, 227, 263, 264, 329, 382, 412, 454, 455, 456, 477.

*Anthony Curreri* of counsel (*Eugene J. Schwartz,* attorney), for claimants-appellants on Damage Parcels 5 and 129.

*Nathan L. Goldstein* of counsel (*Robert J. Randell* with him on the brief; *Nathan L.* and *Joseph Z. Goldstein,* attorneys), for claimants-appellants on Damage Parcels 11, 112, 307, 438, 439, 440, 525.

*Samuel Goldstein* of counsel (*M. Robert Goldstein* and *Arthur D. Goldstein* with him on the brief; *Samuel Goldstein & Sons,* attorneys), for claimants-appellants on Damage Parcels 21, 22, 23, 66, 67, 85, 86, 87, 88, 167, 168, 232, 272, 273, 285, 363, 419, 427, 463, 488, 489, 490, 491.

*Irving M. Rosen* of counsel (*Alfred D. Jahr* with him on the brief), for claimants-appellants on Damage Parcels 457, 458, 459, 460, 461.

*Sidney Z. Searles* of counsel (*Sidney O. Raphael* with him on the brief; *Raphael, Searles & Vischi,* attorneys), for claimants-appellants on Damage Parcels 68, 69, 72, 149, 523.

*Harris L. Present* of counsel (*Arthur J. Galligan* with him on the brief), for claimant-appellant on Damage Parcel 193.

*Charles Lamb* of counsel (*Lamb* and *Lamb,* attorneys), for claimants-appellants on Damage Parcels 110, 322, 381, 391, 442, 464, 496, 514.

*Alfred D. Jahr* for claimants-appellants on Damage Parcels 28, 29, 30, 277, 279, 280, 281, 293, 424.

*Morris Klausner* for claimant-appellant on Damage Parcel 363.

*Eugene J. Morris* of counsel (*A. Carleton Dukess* with him on the brief; *Demov & Morris* and *Lazarus Joseph,* attorneys), for claimants-appellants on Damage Parcels 323, 359, 387, 388, 389, 390.

*F. W. H. Adams* of counsel (*Satterlee, Warfield & Stephens,* attorneys), for claimants-respondents on Damage Parcel 431.

*Malcolm B. Kahn* for claimants-respondents on Damage Parcels 106, 107 and 109.

*Philip A. Paulson* for claimants-appellants on Damage Parcels 516, 517.

*Monroe Goldwater* of counsel (*Leon Liner* with him on the brief; *Goldwater & Flynn,* attorneys), for claimant-respondent on Damage Parcel 267.

*John P. McGrath* of counsel (*Jeremiah H. Evarts, Frederick R. Adler* and *Jacob W. Heller* with him on the brief; *Hodges, Reavis, McGrath & Downey,* attorneys), for claimant-respondent on Damage Parcel 462.

*Herman G. Blumenthal* for claimant-respondent on Damage Parcel 176.

*Leo Klauber* for claimants-respondents on Damage Parcels 519, 520.

*Mortimer Jay Goodstein* for claimants-respondents on Damage Parcel 518.

*Michael C. Gray* for claimant-respondent on Damage Parcels 478, 479, 487.

*Bernard L. Bermant* of counsel (*Skinner & Bermant, Leddy & Raber,* attorneys), for claimants-appellants, John Frederick Maxwell (D. P. 8), and others, and claimants-respondents-appellants, 167 West 60th Street, (D. P. 1), National Transportation Co., Inc. (D. P. 477), and others, on review of order denying motion concerning statutory interest.

*Milton H. Harris* of counsel (*Seymour B. Quel* with him on the brief; *Leo A. Larkin, Corporation Counsel*), for the City of New York on review of order denying motion concerning statutory interest.

STEUER, J. By this proceeding the City of New York has condemned all the property consisting of 13 square blocks of somewhat irregular shape but roughly between Amsterdam and Columbus Avenues and 60th and 70th Streets. Over 400 parcels are involved. The court entered several decrees from time to time as expediency and proper practice dictated. These appeals are from portions of the Fifth and Sixth Decrees and involve some 71 parcels. From some of the awards for these the city has appealed, from others the claimant, but in the majority of instances both sides have appealed. In all instances the appeal

and cross appeal, if any, are based on the quantum of the award. The awards cover both residential and commercial properties. These will be considered separately.

The entire proceeding included properties of practically every kind and classification to be found within urban limits. It is the unanimous opinion of this Bench that the dispositions made by Mr. Justice HECHT at Special Term, some under very trying conditions, represent a very high exercise of judicial functions. As will be seen, in only a relatively small percentage of the total dispositions did the parties have occasion to appeal. In the overwhelming majority of instances where appeal was resorted to, as indicated more particularly below, we find that the grounds for appeal lacked persuasion and discussion is warranted only for the reasons hereinafter stated.

We will first consider the residential properties in the Fifth Decree.

We find no error in the determinations from which the appeals and cross appeals have been taken in regard to Damage Parcels Nos. 1, 39, 42, 194, 263–264, 5, 11, 419, 457–461, 68–69, 72, 149, 381, 391 and 28–30, and the decree insofar as these parcels are concerned is affirmed without costs. We find no error in the determinations in regard to the following parcels from which the claimants have appealed: Nos. 112, 307, 438–440, and 442, and the decree insofar as these parcels are concerned is affirmed, with costs to the city against the respective claimants. We find no error in the determinations in regard to the following parcels from which the city alone had appealed: Nos. 293, 363, 387–390, 431, 21–23, 66, 67 and 427, and the decree insofar as these parcels are concerned is affirmed, with costs to the respective respondents-claimants against the city.

In regard to these parcels the briefs of the respective appellants iterate certain arguments which we believe have either no application to the facts or represent misconceptions of the law. We have deemed it advisable in the latter case to point out the respects in which we find the contentions untenable and ineffective to disturb the awards made by Special Term.

The constitutional mandate in regard to the exercise of the right of eminent domain is that property shall not be taken without "just compensation". It further provides that the compensation to be made shall be ascertained by the court (N. Y. Const., art. I, § 7, subds. [a] and [b]). It follows that while the object of the court is to arrive at just compensation, the method by which this is to be accomplished is by means of judicial proceeding. The court does not therefore make an independent appraisal but must rely on the evidence presented to it (*People*

*ex rel. Uvalde Asphalt Paving Co.* v. *Seaman,* 217 N. Y. 70). This does not mean that it is concluded by the testimony of the respective experts as to their opinions of value or their estimates as to the various items which constitute the factors from which over-all value is calculated or determined (*Commercial Cas. Ins. Co.* v. *Roman,* 269 N. Y. 451). It is almost invariably the case that the value, and hence what compensation is found to be just, is not the figure claimed by either the claimant or the city and advanced by their respective experts. The court is not bound to choose between these figures and select one of them based on an evaluation of the capabilities or the character of the respective experts. The same applies to the underlying or breakdown figures of the estimates when such figure is the result of opinion. Among such figures is the capitalization rate to be used when capitalization of income is the appraisal method used. It is now generally conceded that in properties owned for income purposes this method, when due consideration is given to other factors that may be present, is the preferable one for calculating value. It involves capitalizing the net income that the property can fairly be expected to produce, and the rate of capitalization is the percentage of return on his investment that a willing buyer would expect from that property. As this must necessarily be a matter of opinion, it is subject to the same rules as other figures representing opinion are. It has been urged in this proceeding that the court is limited by the rates employed by the testifying experts. There is no such restriction. The court is limited only by the evidence in the record. The instant proceeding is extraordinary in that the great number of contiguous properties elicited testimony covering whole neighborhoods and provided a mass of facts in regard to sales, leases and other transactions which could form the basis of a determination of the usual expectations of real estate owners. But in any case the evidence in the record is the criterion of judgment and fixes the limits of the capitalization rate as it does of all other estimates used in value determination (*Matter of City of New York [A. & W. Realty Corp.],* 1 N Y 2d 428).

The great majority of residential buildings in this proceeding was subject to rent control. Where that is the situation we have indicated that the controlled rents are the surest guide to a fair estimate of rental value (*Matter of City of New York [Washington Sq. Southeast],* 5 A D 2d 821). Various claimants have contested this on the ground that increases in rental have been from time to time allowed, that procedures exist for obtaining additional rentals, and that the whole system of rent controls may be abolished. Taking these arguments in reverse order,

the last is such a remote possibility that it cannot be considered and no indication that purchases are made on that contingency has ever been established. While procedures do exist for increases in rents, the fact that the instant landowner has not availed himself of them is some indication that in the particular instance they would not prove fruitful. As to prior increases, they are reflected in the current rent roll. We find that in all instances where an increase was shown to be a likely possibility Special Term made due allowance for it.

Certain appeals were based upon isolated facts which, if taken alone, would indicate a value greater or less than that found by Special Term (particular instances are Damage Parcels Nos. 11, 21, 22, 23, 39, 66 and 67). Reliance is put upon sales of a comparable property, or even the same property. These sales, though genuine, are by themselves far from conclusive as guides to value. In fact, in several instances where properties were shown to be comparable, the sales of these properties realized different amounts and the average used varied widely from the consideration on each individual sale. In any event, few sales are made in accord with the theoretical standard of a willing buyer and a willing seller. Buyers are naturally prone to seeking bargains — opportunities to buy at a price that would give an unusually high return — and sellers to await the purchaser whom necessity compels to acquire property at somewhat more than it would otherwise realize. The concept of a fluid market such as that existing in regard to corporate securities, where one sale can indicate the value at the time, is just not true with respect to real estate.

As regards the sale of the instant property, differences in time must first be considered. If the sale is the purchase by the present owner and is very close in time to the taking in condemnation, a total disregard of the sale as evidenced by a gross difference between the estimate and the sale price may well lead to the conclusion of a dishonest estimate of value (*Matter of City of New York* [*Val. Stream, etc.*], 152 App. Div. 422). And utter disregard of such a sale is error (*Matter of City of New York* [*Marshall*], 8 A D 2d 365). But a failure to make such a sale the absolute standard of value is not the equivalent of disregard. Here we find that the values fixed by Special Term give due consideration to the sales.

The city objects frequently (example, Damage Parcel No. 42) that in calculating the net income of a property no provision for vacancies or for a management fee was made. Such items are not appropriate to all buildings. Where rents are modest due

to controls, experience, as shown in the record, reveals that no appreciable vacancies are found. To apply a rule of thumb percentage in such instances is unrealistic. The same is true of properties where the minimal services of management are almost always performed by the owner. While his time may be said to have some value, it is not a significant figure that must be considered.

A question of frequent recurrence relates to the effect of admissions contained in franchise tax returns and in applications for writs of certiorari to reduce taxes on the realty. Such admissions are either of fact, such as annual rentals or expenditures, or opinions as to value. As to the former — admissions as to fact — undoubtedly there is an admission binding on the claimant. We find nothing to indicate that Special Term failed to give full effect to such admissions. As to opinions of value, there is a distinction between franchise tax returns and applications for writs. In the former, the value is supposed to represent the amount at which the property is carried on the corporate books. This may be the cost price or whatever other figure is occasioned by the accounting practice of the corporation making the return. It is not an admission of value in any sense and not binding as such. The situation in regard to the statement of value in a writ is somewhat different. There it is an admission — but only an admission of what the owner believes the value of the building to be. A certain degree of cynicism is no doubt warranted by the very general practice of landowners who have applied for writs of putting down estimates that vary widely from the claims that they make when the property is about to be condemned. As these figures cannot be reconciled, the conclusion is inescapable that one estimate or the other, and possibly both, bear little relation to the true opinion of the owner, and his statement that the estimate represents his opinion is false. But the constitution makes no provision for distinguishing the compensation to be given to an honest applicant and one who lets his desires outrun standards of common honesty. "Just" compensation does not mean compensation limited to the just. An admission of an opinion is not controlling as to the fact. The realization that the admission is not binding has been hailed in some quarters by the assertion that there is one value for condemnation and another value for taxation. The genesis of such a contention is apparent — it is by sophistry out of greed. Value is the same regardless of the nature of the proceeding. However, the same property may have different values at different times. If a proceeding to fix

value for tax purposes is sufficiently close in time to the time of taking, the adjudication would provide a standard common to both proceedings and binding on all concerned.

We come now to those residential properties where we do not agree with Special Term's conclusions. Damage Parcel No. 27 was a six-story elevator apartment with six stores. The court's award was $491,000. The controversy turns on the rental to be allotted to the stores. These stores were under lease and it is undisputed that the actual rentals for the building amounted to $67,000. The claimant urged that under conditions existing at the time of taking a rental of $82,000 could have been obtained. We agree that the actual rentals are no absolute criterion. Here there was no claim that the leases were improvident when made or that their terms were unusual. While it is a fair presumption that a willing buyer would project his offer on the basis of what return he could obtain rather than on what the seller was receiving, it would be contrary to general experience to believe that he would ignore existing leases which had an appreciable period to run, with the consequent effect that the return he expected would not be realized for some years. Under the circumstances, we think a due allowance for this factor, plus the fact that the estimate of the claimant's expert was somewhat overoptimistic (it was not accepted by the court) would reduce the value to $450,000. And the award should be modified to this extent with costs to the city.

Damage Parcel No. 384. Very much the same situation is presented in this parcel. A reduction in the award from $62,000 to $57,000 would provide a close adjustment between the actual income and the potential. The award should be so modified, with costs to the city.

Damage Parcel No. 329. This parcel consisted of a five-story tenement divided into 20 apartments which were rented furnished. The rents were controlled. The claimant's value was $65,000 and the city's $38,000. The award was $50,000. There was no substantial dispute as to the underlying figures and the controversy revolves around the proportion of the actual rentals (which are practically conceded to be the proper rentals to be expected) that is to be attributed to the furniture. Claimant takes the view that the furniture was worthless and its presence in the apartments was merely a subterfuge to induce the rent authorities to allow a higher rental. The contention must be that the Temporary Rent Commission was either misled or acquiesced in this barefaced effort to mulct the tenants. While we do not seek to equal the claimant's cynicism, we conclude if the effort to mislead the commission was successful, it enjoyed

equal success with us to the extent that the usual allowed increase is to be attributed to the furniture. We find that this would reduce the value of the parcel to $42,000, and the award should be so modified, with costs to the city.

Damage Parcel No. 129. This property is a five-story tenement. It was over 70 years old at the time of taking and despite unusual expenditures for maintenance was still in poor condition. Moreover, its heating facilities did not conform to the law and an installation probably too expensive to continue the building as an economic unit would be required if it would be permitted to continue in operation. The court properly struck the claimant's written appraisal as being on an improper basis, and his expert's oral testimony was not convincing. He claimed a value of $60,000, reduced it to $58,000, and the claimant's brief asks for $45,000. Applying capitalization to this property would not yield a land value consonant with the land in the vicinity. If this is adjusted, a value of $27,000 would result. We can find no basis for a higher valuation, and the award should be accordingly modified with costs to the city.

Damage Parcel No. 193. This five-story building located at 146 West 64th Street was formerly a hotel. In 1954 it was converted to a single-room occupancy at considerable expense. Rooms are rented furnished. In this and other properties similarly operated, both parties concede that the proper method of appraisal is based on what a rooming house operator would pay to the owner as his rent. In numerous cases it was established in instances where that was actually done that the rental paid bore a distinct relationship to the amount that the rooming house operator could collect from his tenants and the ratio varied between 35% and 40% of that figure. The determining factor between those figures was the desirability of the particular house, the owner of the better conditioned and located house being able to command the higher percantage. The city contends that a valuation based on this method gives credit to the operation of a business and so is improper, relying on *People ex rel. Hotel Paramount Corp.* v. *Chambers* (298 N. Y. 372). The distinction is one of degree. A hotel depends largely for its income and success on the ability of its management and the facilities other than housing that it supplies to its guests. In fact, its income is largely derived from such activities.

It should be noted that the case relied on limits its holding to a hotel catering to transient guests. There is no similarity between such an institution and one with permanent tenants where the services supplied are minimal adjuncts to providing shelter. The city does not go so far as to advocate that the

method of appraisal indicated as proper in *People ex rel. Hotel Paramount (supra)* should be applied to this so-called residence club, or to rooming houses generally. It advocates an estimate of the rental value of the rooms. There is nothing wrong with such an approach and under ideal conditions the city's method and the claimant's would reach the same total. The difficulty is that the only source of comparable rentals for such rooms is from rooms in rooming houses. The city's experts in justifying their estimates adopt the expedient of taking apartment space or rooms from multi-unit rentals as their standard. (On occasion the record here reveals that they adopted the same method employed by the claimants.) We believe the formula employed, namely, a proper percentage of what an operator could obtain as gross rental for the rooms rented furnished, is the proper standard.

It does appear here that somewhat unusual factors do exist. For reasons that may be surmised but have not been proved, a rental somewhat in excess of what might reasonably be expected is being realized. By using the rental justified by reasonable expectation we find that the value of the property is $145,000, and the award of $127,000 should be modified accordingly, with costs to the claimant.

Damage Parcels Nos. 279–281. There is no dispute but that capitalization is the proper method of appraisal of these income properties in a single ownership. Nor is there any substantial dispute as to the underlying figures, with one exception. That is the expense of operation. A franchise tax return gives this figure at $15,229. As we have seen, this is a binding admission but only to the extent that it shows what was actually expended and is not conclusive as to what the reasonable cost of operation would be. As a landlord can reasonably be expected to spend the minimum that operation should cost, his actual expenditures should be a fairly close guide to that estimated figure. However, it is not always the case. Here the city estimates the figure at $14,581. We find that, in view of the admission in the tax return and the grossly shrunken figures estimated by the claimant, the figure given by the city's expert should have been used. Using the other figures practically agreed upon by both parties, the result reached would be $148,500, and the award of $163,000 should be modified accordingly, with costs to the city.

Damage Parcels Nos. 106, 107, and 109. While these parcels were tried separately, the considerations governing them are the same. They are all small and aged tenements. As income producers they would just about reach the assessed valuations. Claimant did not rely on capitalization but sought reproduction

cost as its building value. In addition to the fact that in none of these cases was the proof competent, the method was improper. Reproduction costs of a building generally represent the highest value that can be placed on a structure and hence are offered by a claimant in tax certiorari proceedings to reduce an assessment (*People ex rel. Hotel Paramount Corp., supra*). But while the value cannot be more than the reproduction cost, it may well be less. The ultimate test of the value of an improvement is what it adds to the value of the land (*Matter of City of New York*, 198 N. Y. 84). There are many situations where this figure would be less than what it costs to reproduce the structure, less depreciation. Among such situations, " An extremely valuable piece of land may have upon it cheap structures which are a detriment rather than an improvement " (*Matter of City of New York, supra*, p. 87). This is what the record reveals here, and that interpretation is indorsed by claimant's argument on land values. In Damage Parcel No. 106 we find that the maximum value that can be given the building is $28,000, and that, added to the land value found by the court in accord with other values in the vicinity, gives a total of $42,000. In Damage Parcel No. 107, the maximum return that it is shown the building could produce is under $1,500 per annum. A value of $12,000 represents its highest economic value which, added to the land, gives a total of $26,000. Damage Parcel No. 109 has a building capable of a slightly higher return, reflecting a building value of $14,000 which, with the land, would give a total of $28,000. The awards should be modified accordingly by reducing them to these respective amounts, with costs in each instance to the city.

Damage Parcels Nos. 85 to 88, inclusive. These four properties are tenements in a common ownership. The court found a value of $97,000. Among the factors to be considered are a net rental return of approximately $8,000 per annum, the purchase of the property by its present owner in 1950 for $50,000, and land values in the neighborhood. Giving due consideration to the fact that the sale was made eight years before the taking in condemnation and that real estate values have increased, applying the highest percentage of increase testified to by any expert the value on the taking date would be $70,000. But taking the other factors into consideration we conclude that this must have been a particularly fortunate transaction for the claimant and that he purchased it for less than its value. This conclusion is fortified by the opinion of the city's experts, who give the property a substantially higher value. However, the return realizable, the nature, age and condition of the buildings indi-

cate that the value does not reach the amount awarded. We believe that these buildings enhanced the land value to the extent of $28,500, and the total value would therefore be $90,000. The decree should be modified accordingly, with costs to the city.

Damage Parcels Nos. 167–168. These parcels are rooming houses of inferior quality. Applying the formula hitherto discussed, they would have a maximum value of $52,000. The award of $60,000 should be accordingly reduced to this amount, with costs to the city.

We next consider the commercial parcels in the Fifth Decree.

In the seven commercial properties embraced in this decree we find no error. The awards in respect to Damage Parcels Nos. 211, 516–517, 523 and 277 from which both sides appealed should be affirmed, without costs. The awards in Damage Parcels Nos. 267, 285 and 525 from which the city appealed should be affirmed, with costs to the claimants.

As to certain of these properties increases were sought in the awards because it was assumed items of value were not given consideration by the court; in others the city claimed that awards took into consideration items not properly to be considered. An examination of the record in each instance reveals that where we agreed with the contention to the extent that the item should or should not receive consideration the award was nevertheless justified, and the assumption that the court did or did not give weight to the disputed item, as the case may be, finds no justification in the figure found.

Four of these buildings were owner-occupied factories. In each instance appraisals were made on the basis of the rental values. These values were ascertained by the rentals received in comparable premises. In an area as extensive as this it was possible to find instances of rentals at widely varying figures. It is claimed to be error that Special Term did not adopt one of these extremes as its basis. By means of judicious selection and by weighting the rental by such factors as difference in location and in specialized features in either the building under review or that used as a basis for comparable rental, a figure could be found to support pretty nearly any estimate that an expert might testify to. It was never claimed that there were no rentals that supported the figures adopted by the court. And as these generally lay well within the extremes put forward by the contending experts, they would in all probability more nearly approximate rental value than any of the examples which, it is now claimed, it was error to ignore.

We turn now to the Sixth Decree. This decree makes determination with regard to 27 parcels. We find no error in regard

to Damage Parcels Nos. 110, 226, 227, 322, 454, 455, 456, 463, 477, 496 and 514 as to which both sides have appealed and the awards as to these parcels should be affirmed, without costs. We likewise find no error with regard to the award as to Damage Parcels Nos. 488–491, and this award from which the claimant has appealed should be affirmed, with costs to the city. We likewise find no error in regard to Damage Parcel No. 424, from which the city has appealed, and this award should be affirmed, with costs to the claimant.

In certain of the foregoing trials the same arguments were advanced as were put forward in connection with the claims which constituted the Fifth Decree in this proceeding and no further discussion is required. Questions, however, were raised in connection with certain damage parcels which were not presented in the Fifth Decree, and it is deemed fitting to set out the reasons which directed the course of decision.

Damage Parcel No. 110. This property is a 12-story building occupying the entire block front of the west side of Columbus Avenue between 62nd and 63rd Streets. There was no dispute as to any of the underlying figures necessary to reach a value by the capitalization method, so there can be no dispute that the value so found exceeds the award. The capitalized figure is $2,729,000. The award was $2,403,000. Against this is the established fact that the property was purchased in 1949 for $1,502,000. Evidence of a general increase in real estate values would indicate a value at the time of taking of $2,179,000. The conclusion is inevitable that the owner made an unusually fortunate purchase and, in addition, has been fortunate in procuring the rentals which it has. Weighing both these factors, it will be seen that the result reached by the court gives a fair proportion to each. The city's chief grounds of disagreement are based on an attempt to hold the claimant to its opinion of value as stated in applications for writs of certiorari. It must be conceded that claimant there expressed an opinion so irreconcilable with its contention here that faith in the sincerity of the opinions could not be entertained. We have, however, nothing to add to what has already been said on this subject. Unfortunately, the appraisal methods and their presentation adopted by the city leave something to be desired in this connection. The court trod a path through these respective efforts to fight fire with fire to a conclusion about which we feel there can be no genuine complaint.

Damage Parcel No. 322. This parcel located at the corner of West End Avenue and 67th Street was improved with a gas station. It was leased to a prime tenant at an annual net rental

of $18,000 a year. At the time of taking the lease had 14 years to run. The claimant's theory is that the actual rental represents the rental value and capitalization would result in a value of $300,000. The court found that the rental value was $14,000 a year, a figure justified by the evidence of comparative rentals. This would result in a value of $228,700. However, the court gave an additional credit for the value of the lease — admittedly a proper procedure. A lease for a rental in excess of the reasonable rental value may be considered as an item of value when the excess is due to the availability of the property for a particular use by the tenant in occupation (*Matter of Port of New York Auth.*, 2 N Y 2d 296). Where these factors appear and the continuation of the lease is not threatened by any question of the tenant's responsibility, the present value of the excess for the period of the lease, plus renewals provided for therein, is an additional element of value. No serious objection is raised with regard to the calculation made by the court according to this formula. We do not regard as serious the argument based on a typographical error as to the remaining period of the lease. Nor can we give any weight to the argument that the lease was terminated by its terms by virtue of the taking in eminent domain. True it is that "excess rent" is not a right in perpetuity and it terminates with the existing lease, plus renewals provided for in the instrument. But the termination of the lease by condemnation, though it affects the rights of the parties to it, has no bearing on the allowance of excess rent. The lease would in any event terminate with the claimant's loss of title. It is the condemnation which gives rise to the claim for "excess rents."

Damage Parcels Nos. 454 and 455. These parcels were tried together and one award given for both. The questions in regard to Damage Parcel No. 455 are routine and nothing need be said in regard to the findings. Damage Parcel No. 454 is a three-story fireproof building with a two-story penthouse. It was altered in 1947 to fit the needs of its owner who is engaged in the manufacture of pharmaceuticals. The special features which fitted the building for this use were interior wall finishes, dehumidifying equipment, recessed lighting, wall niches for scales, and dropped ceilings. In addition, the offices were more elaborate in their finish than is usually the case in factories. For these reasons the claimant insisted on a valuation based on reconstruction cost less depreciation. Claimant contends that the court was in error because this method was not used, and the city makes a claim of error because it was. Actually, what the

court did was to fix a rental value giving consideration to the special features contained in the building.

There is also a dispute as to the land value found. The claimant objects because the court did not use as its basis for comparison an isolated sale made under rather unusual circumstances and bringing the seller a price in excess of any other property in the area. The city's objection is that an increment was allowed due to the location of the property in conjunction with a railroad siding. Neither contention merits discussion and we return to the valuation of the building.

Reproduction cost as a measure of value, except to establish the maximum value that can be placed on a building for purposes of taxation (*People ex rel. Manhattan Sq. Beresford v. Sexton*, 284 N. Y. 145), is limited to specialties (*Matter of Semple School for Girls v. Boyland*, 308 N. Y. 382, 389). A specialty has been variously defined. The definition most generally accepted is a building designed for unique purposes (*People ex rel. New York Stock Exch. Bldg. Co. v. Cantor*, 221 App. Div. 193, affd. 248 N. Y. 533). A more inclusive definition is a building which produces income only in connection with the business conducted in it (*People ex rel. Hotel Paramount Corp. v. Chambers*, 298 N. Y. 372, 375). Definitions must be considered in context. Thus it is apparent that the purpose of giving a structure the designation of a specialty is to provide an appropriate method of appraisal. This may be positive in that it is a just method, or negative in that outside circumstances prevent the use of other methods which experience shows would produce a more scientific result. For this reason the same kind of building might well be deemed a specialty if located in a particular place and not be so considered if located elsewhere. An example would be a theatre. It must be beyond dispute that in a town or city that has only one theatre, if the theatre is condemned the only recourse open to the owner, if he desires to operate a theatre, is to build another one. (For the purposes of value assessment the radical and extensive alterations necessary to convert a standard loft or other similar building into a theatre is the equivalent of building. It is the rule that buildings are to be assessed as in the condition they enjoy at the time of appraisal if conversion to another form involves substantial cost or change [*People ex rel. Sheffield Farms v. Lilly*, 270 App. Div. 812].) So, to compensate such an owner the cost of building another theatre, less depreciation, is the only appropriate method. On the other hand, in a city which has more theatres than can be operated profitably that is not the situation at all. The theatre

owner who has lost his property can replace it by a transaction which is of frequent occurrence — he can rent or buy an existing theatre. The condemned theatre is no less a specialty, in the sense that it produces income solely in connection with the business conducted in it, but the employment of replacement cost as a method of valuation is inappropriate and produces an unrealistic result. The same is true of other buildings such as garages, warehouses and the like where the large number in the jurisdiction gives rise to more or less frequent sales and rentals, thus producing a better guide to current value than the cost of reproducing the building taken. If a building is truly unique so that only the owner would have use for it, then there can be no buildings like it, no comparable transactions, and no way for him to replace except by rebuilding. So, both as a matter of just compensation, and by necessity, reproduction cost is the only criterion of value.

One other factor remains to be considered. It must be shown that the building would reasonably be expected to be replaced. It is hard to imagine a building more specialized than a lighthouse. If the governmental authorities discontinue the use of a lighthouse it sometimes passes into private hands. If one in private ownership, and consequently no longer functioning to guide vessels, should be taken in eminent domain its reproduction cost would hardly be considered the measure of its value.

Applying these considerations to the building under review, the record shows it to have features which in a sense distinguish it from most other factories. But it is far from unique in its structural character. In fact, it appears that it was converted from a bakery practically without structural change. Its distinguishing factors might be superfluous for more general use but they would not interfere with such use. So that the difficulty in renting it would not be to find a tenant but to find one who would pay additional rent because the building contained these added attractions. Whether there is added value because of such features is a question of degree. Tenants undoubtedly pay more for premises of a better grade of construction or finish even though the better grade might not be essential for their purposes. When the so-called improvement amounts to luxury or eccentricity, that ceases to be a fact. Up to a point there is additional rental value, beyond that point, no. The court gave what we believe to be a proper allowance for these features.

Apparently claimant's expert recognized the cogency of the approach outlined above. His appraisal was based on the fact that the owner was enabled by virtue of the added features to

conduct a very profitable business on the premises. That is irrelevant. Likewise, the city's claim that the court must have followed the claimant's theory because the award exceeded the city's estimates is baseless. This type of argument has the one advantage of a respectable age. Forty years ago it was written: "The mere fact that the court did not accept the testimony of the city's experts as to value does not show that he was influenced by the fanciful and speculative plan presented by the claimants" (PAGE, J. in *Matter of City of New York [Inwood Hill Park]*, 197 App. Div. 431, 435 — an opinion notable not only for good law but for its literary allusions).

We come now to those parcels where we believe that modification of the decree is in order.

Damage Parcel No. 412. This property is a public garage. The court found a value of $294,000. The owner bought this property for $165,000. On this investment he was able to lease it on a profitable basis for about $25,000 a year. Both figures, the rental as well as the purchase price, are below the respective reasonable values. But at the time of taking, this lease had 17 years to run. We cannot visualize a willing buyer faced with this certain limitation of income paying a price based on a theoretical income to be realized in a future so distant that no prudent man would invest on the possibility of what it might bring. We believe an award of $262,000 would conform with the facts, and the award should be modified accordingly, with costs to the city.

Damage Parcel No. 232. This property consists of a theatre and stores which the court valued at $690,000. The theatre had been rented to a tenant at $36,000. The lease came due some months prior to condemnation and at a time when the taking was common knowledge. Leases on a month to month basis at a reduced rental were entered into for both the stores and the theatre. Had the property not been condemned, the record shows reason to believe that renewals would have been made at rents somewhat in excess of the expiring rents. On this basis we find that a value of $740,000 would be proper and the award should be modified accordingly, with costs to the claimant.

Damage Parcel No. 464. The building on the property was of minimal value and the only issue concerns land valuation. The city objected to two increments allowed by the court. The first was an allowance of 10% for the value of access to a railroad siding plus light and air resulting from the fronting on the right of way. We find this increment entirely justified and the possibility of a change in the right of way too remote to deny the allowance. The court also allowed a 20% increment for plottage.

It is conceded that the usual plottage increment for an assemblage in one ownership is 10%, but the argument was accepted by the court that this accumulation of eight unit lots was exceptional and merited a higher increment. We agree that it does but there is a point where accumulation ceases to be an additive. We believe that 15% would be the highest increment that assemblage could add to these units. The award accordingly should be modified by reducing it to $158,600, with costs to the city.

Damage Parcels Nos. 272 and 273. These are two buildings in common ownership but operated separately, and separate awards were made for each. The issue in both cases was rental value. Damage Parcel No. 273 was rented to tenants. At the rentals in effect, with the expenses and capitalization rates in virtual agreement, this building shows a value of $350,000. The award was $388,000. The claimant seeks to justify the award on the claim that the rentals were fixed with the prospect of condemnation in mind. In view of the date of the leases and the absence of supporting facts, we find this contention to be untenable. We therefore modify this award by reducing it to $350,000. Damage Parcel No. 272 was partly rented and partly owner-occupied. We find that while the rents actually received were in many instances below what was reasonable, the estimate of reasonable rental given by claimant's expert was so far in excess of what could be expected or what was realized generally in other buildings that it should not have been given the credit the court gave it. The award should be reduced from $818,000 to $770,000. The foregoing modifications are made with one bill of costs to the city.

Damage Parcels Nos. 323 and 359. These parcels are a single building used as a warehouse. A franchise tax return shows an actual rental of $55,000 per annum. Claimant argued that this figure should be disregarded as it was the result of an inter-company transaction. We find that the proof is insufficient to support this contention. If the lease is given weight it will be found that the remaining figures, which are in substantial accord, will produce a value of $575,000, and the award should be modified accordingly, with costs to the city.

The Fifth and Sixth Decrees should be modified on the law and the facts to the extent indicated, with costs as indicated.

Seventh Decree:

*Per Curiam.* The City of New York by this appeal questions the awards made in respect of Damage Parcel No. 462 (American Ice Company, claimant) by the Seventh Separate and Partial

Final Decree entered February 19, 1960. No exception is taken to the land value found at Special Term; the city's attack is addressed to the valuation of the buildings on the land and of the machinery they house. The property in issue, which was used by the claimant as an ice manufacturing plant, is described in the opinion of Special Term reported at 24 Misc 2d 190.

The standard of value adopted by the court was cost of reproduction less accrued physical depreciation. No allowance was made for obsolescence or functional depreciation and in our opinion properly so; the city's request for such allowance lacks sufficiently reliable factual support in the present record.

On the basis of the 38-year age and an anticipated 80-year life for the buildings, the court found that they had depreciated 47½%. On the other hand, it held that a depreciation allowance of 40% for the machinery was adequate. We agree with the city that an increase of the latter figure to 47½% is required. Special Term found in substance that the buildings were especially designed as an ice manufacturing plant; and that the machinery was specially adapted to ice manufacture in those buildings, was installed in a permanent manner and was intended to be a permanent accession. The implication of such a finding is that the useful life of the machinery will not exceed that of the structure with which it is in permanent conjunctive use. The city appropriates only real estate and an award for the machinery is required because it constitutes fixtures, that is to say, partakes of the nature of real estate (*Matter of City of New York [Allen St.]*, 256 N. Y. 236). Under the circumstances presented here the depreciation rate applied to the fixtures should not be deemed less than the rate applied to the structure.

The depreciation allowance was too low for another reason. Although claimant's appraiser estimated the useful life of the machinery at approximately that of the buildings, he justified his lower allowance on the theory that depreciation is less during earlier years. This theory was not adopted with respect to the buildings, to which it would seem in principle equally applicable, and we cannot accept it with respect to the machinery. For the measure of just compensation remains fair market value even where depreciated reproduction cost is taken as its appropriate index (see *Matter of City of New York*, 198 N. Y. 84, 88; *United States* v. *Wise*, 131 F. 2d 851); and in employing the measure it would appear unrealistic to impute to property a remaining life longer than the best estimate indicates. Neither vendor nor vendee would bargain on that basis. Indeed, the appraiser conceded this when he said that an automobile

depreciates least during its first year " as far as the owner goes, not as far as resale price."

The city contends, secondly, that Special Term was in error when it found that " the 660-ton daily capacity of the plant was appropriate in view of the seasonal nature of the business, since that capacity was exceeded on many days of peak demand." On the contrary, the city urges a discount from the award to reflect the permanently idle capacity which in its view the record reveals. To the extent that view purports to be posited on declining trends in the ice manufacturing industry generally and on competition arising in various ways from the demand for cube and crushed ice, the evidentiary support for the city's position is in our opinion too indefinite and speculative to warrant a change in the award. If we confine ourselves to the evidence relating directly to claimant's plant, however, the conclusion that an award has been made, contrary to the weight of the evidence, for noncompensable inutile capacity is difficult to avoid.

Claimant's ice was manufactured by immersing large cans of water in tanks of cooling brine. The tanks, eight in number, each approximately 112 feet long, 23 feet wide and four feet deep, could accommodate an aggregate of 7,282 cans. The city submits that two of the tanks, those numbered 7 and 8, had been out of use since long before the taking date of the property. In corroboration it points to the claimant's daily log sheets from December 11, 1956 to June 27, 1957, in which operating statistics relating to each tank were recorded. These sheets are forms in which the identification number of each of six tanks is printed in two places, but no spaces are reserved for statistics relating to tanks 7 and 8 and no reference to tanks bearing those numbers is to be seen. As the sheets report the quantity of ice drawn from each tank each day, the plain inference is that tanks 7 and 8 were in continuous disuse — an inference borne out by the plant's accelerating annual decrease in daily average ice production from 430 tons in 1953 to 250 tons in 1957, and strongly supported by weekly production reports for the period July 7–December 29, 1957, which disclose that the average number of tons made per day was 471.74 during the first week of the period, 442.24 during the second week, and less than 375 during the remainder of the summer and thereafter.

Claimant's rebuttal is not persuasive. Although its expert witness Brizzolara, a refrigeration engineer, was shown the log sheets and stated, " Six tanks apparently are reported here, with no provision for No. 7 and No. 8 in that log ", claimant produced no plant employee to testify concerning the two tanks.

Claimant was made aware as long ago as June, 1959 of the city's vigorous contention that tanks No. 7 and No. 8 were in disuse. Nevertheless, neither in its brief nor upon argument has it furnished any plausible explanation of the failure to take temperature readings of those tanks.

In its brief claimant stated, "At most these sheets show non-use during a cool period and nothing more". On oral argument its counsel pointed to the dual temperature readings given in the log for each of tanks 5 and 6, and suggested that one reading in each dual set applied to tanks 7 and 8, thus indicating they were in production. These dual temperature readings for each of tanks 5 and 6, however, are fully consistent with the description of those tanks in the inventory of machinery, since they contained cooling systems different from those in the other six tanks. (Tanks 5 and 6 each contained two brine coolers and two liquid level indicators.) Furthermore, Brizzolara, referring to the temperature recordings in the log, testified "there are six tanks that are reporting their brine." Subsequently, counsel referred to an isolated three-day period during which tanks 5 and 6 were said, questionably, to have exceeded their capacity to a minor degree and implied that this showed tanks 7 and 8 were in active use. These random gropings for an answer to the city's point fail of the mark, nor is the point met by generalized testimony from claimant's experts and one of its non-operating officers, all strangers to the actual day-by-day functioning of the plant, as to the need of 660-ton capacity because of fluctuating demand or as a reserve.

We have not overlooked evidence to which claimant alludes pertaining, among other things, to certain increased sales of ice produced in its other plants in the New York City area and to the capacity of two existing plants leased or purchased to replace the instant one. The speculative inferences to be drawn from such evidence should not override the documented production data relating to the particular plant with which this proceeding is concerned. Statistics of sales at other plants are not in themselves probative of useful productive capacity at the plant taken in this proceeding. The acquisition of other plants with 690-ton capacity is not by that fact probative of the capacity actually employed in the instant plant. Convincing proof would require a full collateral inquiry, which was not undertaken; indeed, claimant itself objected to exploration of the "wisdom" of its acquisition of other plants as irrelevant.

An adjustment of the fixture award is accordingly required, as is a complementary adjustment of the structure award, for the instant structure was originally designed to house and serve

industrial operations since substantially diminished, with a consequent lessening of its enhancement of the value of the land (see *Matter of City of New York, supra*; *Matter of City of New York* [*Newtown Creek*], 284 N. Y. 493). While the amount of either adjustment cannot be calculated with fine precision, our review of the record convinces us that reduction of the fixture award by 25% and the structure award by 10% would be fair.

Nonuse of two of eight tanks and the added consideration that maximum average daily Summer production aggregated 471.74 tons demand a finding that not less than one fourth of the 660-ton rated capacity was excess. It does not follow, however, that the structure is to be deemed overbuilt and unsuited to the reduced operation in identical proportion.

On the basis of the foregoing, the Seventh Separate and Partial Final Decree entered February 19, 1960, so far as it relates to Damage Parcel No. 462, should be modified, on the law and the facts, to the extent of reducing the award therein for land and improvements to $527,610, and the award therein for fixtures including machinery and equipment to $558,717, and should be otherwise affirmed, with costs to appellant city.

The Seventh Separate and Partial Final Decree so far as it relates to Damage Parcels Nos. 516 and 517 should be affirmed, without costs to any party.

Eighth Decree:

The Eighth Separate and Partial Final Decree so far as appealed from, relating to Damage Parcel No. 232, should be affirmed, with costs to the City of New York.

BOTEIN, P. J. In these condemnation proceedings, Special Term denied both branches of the claimants' motion. First, claimants moved that, in lieu of interest, they be paid the net rental value of their premises during the period for which interest was allowed. Second, contingent on denial of the first, and based on the contention that "4% per annum is not a factually fair rate of interest", they sought an order directing the taking of proof as to the proper rate of interest.

Section 3-a of the General Municipal Law provides that the rate of interest to be paid upon any judgment or accrued claim against a municipal corporation arising out of condemnation proceeding "shall not exceed four per centum per annum". Special Term had allowed interest on the awards in these proceedings at the maximum rate of 4% from February 28, 1958, the taking date, to the date of payment (22 Misc 2d 609). Claimants dissatisfied with the allowance have taken appeals.

It is settled doctrine that a condemnee is constitutionally entitled to "some sum in addition to the bare value of the property at the date of taking for the delay in making payment, so that the compensation may be just" (*Matter of City of New York* [*Bronx Riv. Parkway*], 284 N. Y. 48, 54, affd. 313 U. S. 540). And since the ascertainment of just compensation is a judicial question (*Matter of City of New York,* 190 N. Y. 350, 353; *Monongahela Nav. Co.* v. *United States,* 148 U. S. 312, 327; *United States* v. *Commodities Corp.,* 339 U. S. 121, 124, n. 3; and see N. Y. Const., Art. I, § 7, subd. [b]), the specific provision in section 3-a of the General Municipal Law does not foreclose consideration of claimants' contentions as to what constitutes just compensation.

In these proceedings it appears that various owners were permitted to remain in temporary occupancy after the taking date and were charged varying rates, on a rental basis, in excess of the amounts that would have represented a return of 4% per annum on their ultimate awards. The asserted unfairness has evidently prompted the present suggestion that rental value be substituted for interest.

We see no unfairness. The condemnee's sole damage is delay in the payment of his award. His sole claim is to an additional element of compensation for the delay, which in all logic should stem from the withholding of the money he was entitled to receive on the date of taking, and not from the rental value of property in which he no longer held any interest. "This additional element of compensation has been measured in terms of reasonable interest" (*Albrecht* v. *United States,* 329 U. S. 599, 602), or interest "at a proper rate" (*Jacobs* v. *United States,* 290 U. S. 13, 17); and while it is not "quite accurate to say that interest as such is added to the value at the time of the taking" (*United States* v. *Klamath Indians,* 304 U. S. 119, 123; *Phelps* v. *United States,* 274 U. S. 341, 344), the addition of interest has been traditional in New York condemnation proceedings (*La Porte* v. *State of New York,* 6 N Y 2d 1, 6).

Claimants assert, however, that the Court of Appeals has announced a departure from the doctrine that "delay in making payment" is to be compensated for by interest. They seize upon a statement in *La Porte* (*supra*) that "interest in condemnation cases until the award is a substitute for the use of real property" (p. 7). Too much is made of a remark wrenched from its setting. The claim of the landowners in *La Porte* was for interest, not rental value. Unaware of the appropriation of their premises, they had continued in undisturbed possession for a time. The court's concern was with the availability to

the condemnor of that circumstance as an offset to the interest claim—with "the denial of interest during periods while the owner has enjoyed the full beneficial use of his premises" (pp. 6–7)—rather than with the evaluation of that beneficial use as a norm of compensation to the owner. Consideration of the opinion in full and of the authorities mentioned makes it quite clear that no new doctrine such as claimants espouse was promulgated.

Of course, where the fee of property is not taken but only its temporary possession, rental value ordinarily measures the award (*United States* v. *General Motors Corp.*, 323 U. S. 373). But even in such cases, the sum added to the award for delayed payment is conventionally interest, not rental value for the period of delay (*Phelps* v. *United States, supra*; *Kimball Laundry Co.* v. *United States*, 338 U. S. 1, 21), although, if claimants' contention were sound, it would be particularly in cases of this type that we might expect to find rental value allowed rather than interest. On the contrary, where a landlord's fee and a tenant's use are both taken, the landlord is limited to interest on his award notwithstanding that the tenant's use has been valued at a greater rate, for the interest "is not allowed as compensation for the use of the property but as compensation for delay in payment of the award" (*United States* v. *6.87 Acres of Land*, 147 F. 2d 351, 353). Claimants cite no case in which their premise has prevailed. In *Smith Corp.* v. *State of New York* (31 Misc 2d 116), it is true, rental value was awarded as compensation for the State's occupancy of the premises before appropriation of title. This case merely applies the above-mentioned measure of compensation when temporary possession is taken; and indicated only that, absent evidence of such measure, damages would be presumed to be the legal rate of interest. (See *Andrews* v. *State of New York,* 19 Misc 2d 217, 227, affd. 11 A D 2d 599, affd. 9 N Y 2d 606; *Matter of Condemnation of Lands for Military Camp,* 250 Fed. 314.)

The second branch of claimants' motion was bottomed on *Bronx Riv. Parkway* (284 N. Y. 48, *supra*) which dealt with section 3-a of the General Municipal Law in its original form. As first enacted (L. 1939, ch. 594), section 3-a made no express reference to condemnation proceedings, but its fixation of the rate of interest payable by a municipal corporation at a maximum of 4% "upon any judgment or accrued claim" was held applicable to such proceedings in *Bronx Riv. Parkway.* The case has pertinence here for two additional reasons: First, it held that condemnees were not denied the equal protection of

the laws because the general 6% interest rate prescribed by section 370 of the General Business Law had been lowered in respect of claims against municipal corporations. "The sovereign and public character of the favored debtors and the lower rates of interest usually applicable on their borrowings may well form a basis for differentiation. The classification cannot be deemed unreasonable" (p. 54).

Second, the case announced the following rule with reference to the sum to be added to an award to compensate for the delay in paying it: "In the absence of evidence as to what such additional sum should be, interest, as provided by law, meets the constitutional requirement" (p. 54); and in this connection the court rejected, as unsupported by any evidence and as contrary to common experience, the condemnees' contention that interest at the 4% rate was so unreasonably low as to deprive them of just compensation (pp. 54, 55). In 1956 section 3-a was amended to its present form (L. 1956, ch. 691). The maximum 4% rate was made expressly applicable to condemnation claims and claims for damages for wrongful death; the maximum rate applicable to all other claims was reduced to 3%. Thus in 1956 (and again in 1957 when section 157 of the Public Housing Law was similarly amended [L. 1957, ch. 70]), the Legislature specifically directed its attention to the amount of interest to be paid on condemnation claims and, significantly, a distinction was made in favor of greater interest upon such claims.

Claimants' motion at Special Term was for permission to adduce the evidence which in *Bronx Riv. Parkway* was lacking. To that end they submitted an affidavit of counsel stating that 6% per annum is factually the fair rate of interest for the use of money in the open money market in New York City where money is borrowed without collateral and where the lender does not receive income tax exemption, both State and Federal; that the largest corporations have not been able to borrow at 4% per annum or less; that the prime interest rate in New York City as announced by three leading banks is 4½%; and that claimants have been unable to obtain 5% loans even when secured by government obligations. But these statements and others of like purport, if proven, would not overcome the presumptive applicability of section 3-a. What Special Term did, with complete fairness and wisdom in our opinion, was to adopt an interest rate which common knowledge tells us reflects a reasonable balance between return and safety. The objective of courts in eminent domain proceedings is to do substantial justice (*Hamersley* v. *Mayor of City of N. Y.*, 56 N. Y. 533, 538; *United States* v. *Miller*, 317 U. S. 369, 375; *United States*

v. *Cors,* 337 U. S. 325, 332); " to see that it is just, not merely to the individual whose property is taken, but to the public which is to pay for it " (*Searl* v. *School Dist., Lake County,* 133 U. S. 553, 562; see, also, *New York, Ontario & Western Ry. Co.* v. *Livingston,* 238 N. Y. 300, 306). And the 4% rate, which commended itself to the practical judgment of the Legislature as a maximum, seems to us a median which cannot seriously be questioned as substantially just (cf. *Hartford Nat. Bank & Trust Co.* v. *Drew & Co.,* 188 F. Supp. 347, 349, affd. 290 F. 2d 589; Mass. L. Q., Dec., 1960, p. 53).

Furthermore, section 3-a, a constitutional enactment, has made municipalities " favored debtors ". The record reveals no offer of proof that the 4% rate unduly favors them. If a municipality expects to pay an award with funds in hand, presumably those funds yield it an income during the period of delay in payment; and if it expects to pay with funds to be borrowed, it saves interest of course on the deferred borrowing. Claimants do not even hint that the municipality, which is the condemnor herein, procured benefits of this nature at rates exceeding 4% per annum (cf. *Agnew Co.* v. *Paterson Bd. of Educ.,* 83 N. J. Eq. 49, 67–69, affd. 83 N. J. Eq. 339; and see General Municipal Law, § 11; Local Finance Law, § 165).

The order entered October 30, 1959, denying certain claimants' motion affecting the several decrees with respect to the allowance of interest should be affirmed, with costs to the City of New York.

BOTEIN, P. J., BREITEL, RABIN, VALENTE and STEUER, JJ., concur.

Fifth and Sixth Separate and Partial Final Decrees unanimously modified, on the law and on the facts, to the extent indicated in the opinion of this court filed herein, with costs as indicated. Opinion by STEUER, J.; order, entered on or about October 30, 1959, *nunc pro tunc* as of October 16, 1959, brought up for review by certain claimants, unanimously affirmed, with costs to the City of New York. Opinion by BOTEIN, P. J. Settle order on notice.

Seventh Separate and Partial Final Decree, insofar as it relates to Damage Parcel 462, unanimously modified, on the law and the facts, to the extent of reducing the award therein for land and improvements to $527,610 and the award therein for fixtures including machinery and equipment to $558,717 with costs to the City of New York; said decree, insofar as it relates to Damage Parcels 516 and 517, unanimously affirmed without costs to any party. Opinion *Per Curiam.* Settle order on notice.

Eighth Separate and Partial Final Decree, so far as appealed from, relating to Damage Parcel 232, unanimously affirmed with costs to the City of New York. No opinion. Settle order on notice.