689 A.2d 817

STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL
PROTECTION, PLAINTIFF–RESPONDENT, v. CLEMENT WILSON
FAIRWEATHER, JR., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued January 22, 1997—Decided March 11, 1997.

Before Judges DREIER, D'ANNUNZIO and NEWMAN.

*Peter R. Bray* argued the cause for appellant (*Bray, Chiocca, Rappaport & Rothstadt,* attorneys; *Mr. Bray,* on the brief).

*Robert P. Grabowski,* Deputy Attorney General argued the cause for respondent (*Peter Verniero,* Attorney General, attorney;

*Michael J. Haas*, Senior Deputy Attorney General, of counsel, *Mr. Grabowski*, on the brief).

The opinion of the court was delivered by

DREIER, P.J.A.D.

Defendant appeals from a condemnation award of $34,000 returned by a condemnation jury. The State initially submitted proof of a fair market value as of 1978 of $21,000; defendant contended the value was $60,000. The State's original appraiser, who had died pending trial, made an updated appraisal showing the value to be $23,000, and the State had deposited first $21,000 and then an additional $2000 after it took the property.

Defendant's parents acquired the property in question in 1949 as a site on which they could construct their retirement home. The foundation of the house had been that of a grist mill built in 1834. Defendant's architect father specialized in Colonial American architecture and designed the house to fit within the architectural scheme of the historic Griggstown area. The property itself is across the street from the "Barracks House," built when the Delaware and Raritan canal was constructed, and is diagonally across the canal from the Bridge Tender's House. Both structures were constructed in the early nineteenth century. In the immediate area are farms and several pre-Revolutionary structures, including a church and homes.

Defendant's father built the house with a picture window looking over the millrace and adjoining meadows. Defendant described in detail the construction of each room and how the foundation was built to accommodate water flow so that flooding would not damage the structure. Defendant also meticulously explained the selection of the stone, wood, stucco and paint, all carefully chosen to recreate a colonial structure. Defendant, now a retired Rutgers University English Literature professor, had an obvious attachment to the house and land far beyond their intrinsic worth.

The State's appraiser determined that the best method to value this property was the "cost approach," but viewed the property from the standpoint of modern construction. For example, he assumed a foundation construction with concrete blocks, although the existing foundation was one of hand placed stones filled in with concrete, following the construction method of the nineteenth century. The appraiser specifically noted that he was evaluating what it would cost to build a building with similar utility, not what it would cost to duplicate this structure. In addition, the State's appraiser did not give any value to two retaining walls, which we will discuss *infra*, nor was defendant permitted to show their cost. Therefore the jury's $34,000 verdict failed to include any valuation for these retaining walls. We note that the reconstruction cost of an historic structure has been held to be a valid basis to determine its value for condemnation purposes. *See Westgate Recreation Assoc. v. Papio–Missouri River Natural Resources Dist.,* 250 *Neb.* 10, 547 *N.W.*2d 484, 494 (1996) and the cases there cited; *Denver Urban Renewal Auth. v. Pogzeba,* 38 *Colo.App.* 168, 558 *P.*2d 442, 443–44 (1976); *Williams v. State,* 65 *Misc.*2d 489, 318 N.Y.S.2d 210, 214 (Ct.Cl.1970); *In re Lincoln Square Slum Clearance Project,* 15 *A.D.*2d 153, 222 *N.Y.S.*2d 786, 802–03 (App.Div. 1961), *aff'd,* 12 *N.Y.*2d 1086, 240 *N.Y.S.*2d 30, 190 *N.E.*2d 423 (1963), 16 *N.Y.*2d 497, 260 *N.Y.S.*2d 439, 208 *N.E.*2d 172 (1965).

Defendant raises six points on this appeal. Defendant's first three points all relate to the judge's exclusion of the $23,000 amended appraisal by the State's original appraiser. The jury therefore only considered the $21,000 appraisal by the State's witness at trial. While we could engage in an extended discussion of the issue, it appears clear to us that the State, having originally established a $23,000 figure as "just compensation," *N.J. Const.* art. I, § 20, should not have been permitted to urge that the property was worth less than this amount. *N.J.S.A.* 20:3–6. Defendant's three points objecting to the exclusion of the various ways he attempted to demonstrate to the jury that the State had in fact valued the property at $23,000 and deposited that sum with

the court go well beyond the argument necessary on this issue. The foundation of compensation law is that "the State has to make its 'best offer' up front." *State v. Carroll*, 123 *N.J.* 308, 318–19, 587 *A.*2d 260 (1991) (interpreting *N.J.S.A.* 20:3–6).

Although it is clear that the offers themselves are not evidential under the statute, judicial estoppel prevents the State from taking a different position at trial concerning the value of the property from that which it had assumed when it made its offers and deposited with the court clerk what it considered to be the property's fair market value. It ill-behooved the State to misrepresent to the jury in its opening statement that it "did make a good faith effort to arrive at ... [a] successful agreement with [defendant], but unfortunately we're not able to do that. But we did deposit what we felt was the fair market value for that property...." Later the State's counsel added, "[T]he just compensation that is due [defendant] is what was deposited back in June of '78. That's the $21,000." The judge mistakenly rejected defendant's argument that she should inform the jury that in fact the State had deposited $23,000 in accordance with its revised original appraisal.

Were this the only issue in the case, we might direct that the value be increased by $2000, since this would have been the maximum effect that this error could have had on the valuation, and it is clear that the cost of any retrial to the parties would greatly exceed this amount. But there are other significant errors which also must be addressed.

Defendant also contends that the State's appraiser erroneously failed to consider the value of the two retaining walls in establishing the total value of the property. It was clear that in 1994 the retaining walls were still in extremely good condition and exhibited no physical obsolescence. They were built between 1963 and 1969, and therefore we must assume that they were in good condition at the time of the taking in 1978. The State effectively summarized defendant's position as an assertion contending that the retaining wall is "really an integral part of the property"

because it was "necessary to have that retaining wall to prevent the house from sliding into the canal. .... [I]f you don't have that wall, ... you can't have that house on that property." The State's appraiser was asked if the retaining walls added any increased value to the property. He replied, "I can't say with one hundred percent assurance to what point [the retaining walls] may have contributed to the value of the property." He stated, however, that he did not consider their cost in his 1985 appraisal, but "must have thought that [the retaining walls] did not have any great significance."

Defendant was asked on direct examination how much he paid to construct the retaining walls between 1963 and 1969; however, the State's objection to what defendant paid for the walls was sustained. Defense counsel proffered that the cost of the walls had been $6500, and what defendant had paid was a relevant fact because it was the kind of thing that would have interested a hypothetical prospective buyer in 1978. The judge determined that defendant's testimony concerning what he paid for the stones fifteen years earlier was not "relevant to any issue in the case."

In a condemnation case, all considerations "which would influence a willing buyer and a willing seller in coming to terms as to the price should be laid before the trier of fact." *Village of South Orange v. Alden Corp.*, 71 *N.J.* 362, 368, 365 *A.*2d 469 (1976). Furthermore, the original cost of an improvement has been held admissible as an aid to valuation in condemnation actions where the "improvement was of an unusual kind or description with the value not readily discernable...." *In re Parking Authority of Hackensack*, 30 *N.J.Super.* 534, 539, 105 *A.*2d 440 (App.Div.1954).

The State acknowledged at the trial that the retaining walls were an improvement to the property and apparently both functional and necessary. It seems reasonable that a buyer in 1978 would have been impressed that the wall had cost the owner $6500 in 1960's dollars to construct and would have concluded that the necessary walls were well constructed and would not need to

be replaced. Such a buyer could well have taken this into consideration in calculating a purchase price for the property. This is "evidence which is reasonably probative of fair market value," and as such is admissible in a condemnation action. *State v. F & J Partnership,* 250 *N.J.Super.* 19, 26, 593 *A.*2d 352 (App.Div.1991). On remand, defendant shall be entitled to introduce evidence of the cost of these retaining walls.

■ Additionally, defendant contends that the judge's limitation of evidence concerning the historical significance of the property was error. We agree. The State contended that the property had no historical significance. The State's appraiser stated merely that the house was in "poor and uninhabitable condition" and that therefore the property had "extremely limited appeal in the marketplace." Defendant, however, attempted to read into evidence the State's answers to two interrogatories:

Question 5: To what use does condemnor intend to put the property?

Answer: Historic readaption and recreational use.

Question 6: What alterations or improvements will be made to the property in pursuance of the use listed in your answer to the preceding interrogatory?

Answer: Property is to be left in its existent state.

■ Defendant therefore wished to undermine the State's trial position that the property had no historic significance, since historical significance, if explained, is a valid factor to be considered in a condemnation case. *State v. Wemrock Orchards, Inc.,* 95 *N.J.Super.* 25, 29–31, 229 *A.*2d 804 (App.Div.), *certif. denied,* 50 *N.J.* 92, 232 *A.*2d 153 (1967). Defendant did not seek out enhancement of value due to historical significance, as such would have required quantification by an expert. *Id.* at 30–31, 229 *A.*2d 804. But the proof was proper to substantiate why the cost of reconstruction must follow early nineteenth century building methods. Clearly, defendant wished to show that the property was located in a historic district, that the house was built in 1950 on the foundation of a mill constructed in 1834, and that the house was built to reproduce a structure of that period. The judge in fact stated that she was not sure whether the interrogatory was or was not inconsistent with the State's position. She recognized that "it

implies ... they [the State] were going to do ... something. ...
And let people—I don't know—tour through it or walk through it
as they do at the [nearby] mule tender's exhibit, or have some
exhibit about the mill or something of that nature." Given the
court's view of these interrogatory answers, defendant should have
been permitted to read these answers to the jury. The answers
logically could have been taken to mean that the State, in pursuit
of its intended historical readaptation and recreational use of the
property, intended to leave defendant's house in the condition it
was in in 1978, even though the State contended it was run-down
and perhaps not habitable.

On the question of interest, with the possible exception of
the period from July 18, 1979 to February 7, 1984 when the
condemnation was stayed at defendant's request and possession
was presumably restored to him, defendant was clearly entitled to
interest at the "prevailing commercial interest rate." *Township of
Wayne v. Cassatly,* 137 *N.J.Super.* 464, 474–75, 349 *A.*2d 545
(App.Div.1975), *certif. denied,* 70 *N.J.* 137, 358 *A.*2d 184 (1976)
(interpreting *N.J.S.A.* 20:3–32). *See also Jersey City Redevelop-
ment Agency v. Clean–O–Mat Corp.,* 289 *N.J.Super.* 381, 400, 673
*A.*2d 1360 (App.Div.), *certif. denied,* 147 *N.J.* 262, 686 *A.*2d 763
(1996).

Defendant had urged before the trial judge that he was entitled
to a reasonable commercial interest rate and had suggested the
Merrill Lynch prime rate as at least a partial measure of that
return. The judge found that this would "plainly create an unfair
windfall in [defendant's] favor, for it would give to him the benefit
of a calculation of interest he simply could never have achieved on
his own."

However, defendant never stated that he should receive the
prime rate, only a reasonable commercial return, of which the
prime rate was one indicator. The prime rate is a rate paid by
favored borrowers on loans, it is not the rate paid by banks or
others to depositors or investors. Yet the prime rate was certain-
ly indicative of commercial rates of interest achievable during the

time periods in this case and it roughly tracked the prevailing commercial interest rates for investors. It was evidential, as were the rates on various government bonds, money-market funds and like indicators. Such data was and is readily available from financial newspapers of the time. The rates paid by the Clerk of the Superior Court, after the rates were freed to reflect market conditions, might also be evidential, but were not binding on the court, especially during the time they were not adjusted for the double-digit inflation of the period. The court had many methods open to it to set the rates, including judicial notice. *N.J.R.E.* 201(b)(3). On remand, this can be remedied by the court.

■ Defendant also contends that interest should not have been abated while he sought his "appellate rights." The judge determined that defendant had not merely appealed, but had "affirmatively sought and was granted a stay of the condemnation proceedings while he pursued unrelated litigation against the State...." This litigation, however, was not truly "unrelated." It was a challenge to the State's authority to condemn, and defendant should not be penalized solely for pursuing his legal and statutory rights. *N.J.S.A.* 20:3–31 provides that interest should be paid by the State "from the date of the commencement of the action until the date of payment of the compensation...." There is a provision for the abatement of interest "for rents and profits derived from the property by the condemnee during the period for which interest is payable ... and/or for the fair rental value of such property or any portion thereof occupied by the condemnee during such period." *N.J.S.A.* 20:3–31.

In this case, however, the State asserted that defendant had been restored to the property and had been permitted the full use of it during the period of the collateral litigation. If this is so, and if there was no charge to him for the use and occupation of the premises, there may be some equitable basis for the State's receiving an abatement. From this record we are unable to determine whether defendant in fact had free and unimpeded use of the property during this period. On remand, the judge should

make appropriate factual findings and then determine whether there should be an interest abatement.

The judgment appealed from is reversed and the matter is remanded to the Law Division for retrial.