# In the Matter of HABERN REALTY Co., Appellant, v TAX COMMISSION OF THE CITY OF NEW YORK, Respondent.

First Department, June 19, 1984

### APPEARANCES OF COUNSEL

*Regina Feder* of counsel (*Leonard Olarsch* with her on the brief; *Frederick A. O. Schwarz, Jr., Corporation Counsel,* attorney), for respondent.

*Hubert J. Brandt* of counsel (*Richard A. Steinberg* with him on the brief; *Wasserman, Chinitz, Geffner & Green,* attorneys), for appellant.

### OPINION OF THE COURT

SANDLER, J. P.

In these consolidated tax certiorari proceedings seeking review of assessments of petitioner's real property at 855 Sixth Avenue, Manhattan, for the tax years 1973/74 through 1981/82, petitioner appeals from a final judgment of the Supreme Court, New York County (Mangan, J.), entered June 28, 1982, confirming the total assessments.

The subject property is located at the northwest corner of Sixth Avenue at 30th Street, in a mixed commercial area

which is characterized south of 31st Street by low-rise tenements and loft buildings. The configuration of the site is irregular. With a frontage of only 47 feet on Sixth Avenue, the bulk of the plot runs west 189 feet along the north side of West 30th Street. A narrow portion of vacant land extends north to West 31st Street and is utilized as a public parking lot and as a passageway to the service entrance of the building. The site is improved with a six-story and basement office and store building erected in 1949.

The existing assessments and the respective appraised value for the subject property advanced respectively by the city's appraiser and the petitioner's appraiser are as follows:

### ASSESSMENTS

| Year | Land | Improvement | Total |
|------|------|-------------|-------|
| 1973/74 through 1980/81 | $800,000 | $1,150,000 | $1,950,000 |
| 1981/82 | 875,000 | 1,125,000 | 2,000,000 |

### CITY APPRAISER

| Year | Land | Improvement | Total |
|------|------|-------------|-------|
| 1973/74 through 1976/77 | $1,440,000 | $510,000 | $1,950,000 |
| 1977/78 through 1978/79 | 1,440,000 | 310,000 | 1,750,000 |
| 1979/80 through 1980/81 | 1,440,000 | 510,000 | 1,950,000 |
| 1981/82 | 1,440,000 | 560,000 | 2,000,000 |

### PETITIONER'S APPRAISER

| Year | Land | Improvement | Total |
|------|------|-------------|-------|
| 1973/74 through 1976/77 | $800,000 | $705,000 | $1,505,000 |
| 1977/78 through 1980/81 | 800,000 | 380,000 | 1,180,000 |
| 1981/82 | 800,000 | 460,000 | 1,260,000 |

Although in disagreement on much else, the city's expert and the petitioner's expert agreed with each other, in accordance with long-accepted principles, that the prefera-

ble method for evaluating this adequately developed income-producing property was income capitalization. (See *Matter of City of New York [First Elephant Estates — La Hermosa Church]*, 17 AD2d 317, 320; *People ex rel. Gale v Tax Comm.*, 17 AD2d 225, 230; *Matter of City of New York [Lincoln Sq. Slum Clearance Project]*, 15 AD2d 153, 161.) The sharply divergent total appraised values reached by the experts derive primarily from the application of different capitalization rates, although the record discloses other disagreements with regard to expenses and rentals that contributed to different estimates of net income.

Having determined the total value of the property for the years in question, the experts then undertook, as required by law, to apportion that value between the land and the building. For that purpose, both experts used sales of property in the immediate area in the preceding years. The method used was to adjust the appraised land values for the sold properties in accordance with the relationship between the amount for which each property was sold and its over-all appraised value. From those indicated land values, each expert derived a figure which he undertook to apply to the subject property, the city's expert using a value per square foot and the petitioner's expert using a unit lot price. Employing markedly different methods to adjust the values each derived from the different sales, the two experts reached strikingly different results with regard to the land value of the subject property.

In confirming the assessments, Special Term concluded that the land values advanced by the city's expert were correct and that they could not be reconciled with the total appraised values found by petitioner's expert on the basis of income capitalization. Without identifying any error in the income capitalization analysis of petitioner's expert, Special Term determined that the incompatability of the appraised values found by petitioner's expert with the land values found by Special Term to have been established rendered the conclusions of petitioner's expert unreliable, and required rejection of petitioner's challenge to the assessed values. We disagree both with the conclusion reached by Special Term and the basic approach which led to that conclusion.

Even if the land value assigned by the city's expert were more persuasively supported by the record than we believe it to be, it is doubtful that such a dispositive effect should have been accorded a value reached in the application of what both experts correctly believed to be the less satisfactory method under the circumstances to determine the total appraised value of the property.

No doubt there are occasions in which a secondary method, although less suitable to determining a reliable value under the circumstances, may be useful to the court in resolving an issue presented by conflicting expert testimony. (Cf. *Matter of City of New York [Lincoln Sq. Slum Clearance Project], supra,* at p 162; *People ex rel. Gale v Tax Comm., supra,* at p 231.) And in the situation which Special Term believed was presented, in which a value derived by the secondary method diverges sharply from the total assessed value found by an expert applying the preferable method, this difference might well justify a closer scrutiny of the data and methodology used by the expert in applying the ordinarily preferable method.

The situation presented is sharply to be distinguished from that in which an alternative value is presented by a truly comparable sale, such as a bona fide sale of the same property, at or near the relevant date. Clearly the price paid on such a sale would be entitled to careful consideration. (*Matter of Zipel Realty Corp. v Finance Admin.,* 69 AD2d 837.) But even with regard to such a sale, it was observed by the court in *People ex rel. Gale v Tax Comm.* (*supra,* at p 231) that evidence "of the price paid at a bona fide sale [of the subject property] during or reasonably near the tax years is not conclusive in determining the value of the property. It would only be one element for consideration to be weighed with all other relevant factors." Although such a sale may be highly relevant to determining value, "the time, the place, the circumstances and the conditions of the sale must be explored." (*People ex rel. Four Park Ave. Corp. v Lilly,* 265 App Div 68, 71.)

In this case, both experts were in agreement that, in the absence of a truly comparable sale, the income capitalization method was superior. The comparable sales method was used only for the limited purpose of enabling the

experts to determine what part of the assessed values they had determined for the property as a whole should be allocated to the land. Central to the method adopted by both experts were the values allocated to land in the assessed values of the properties whose sales they considered. But it is obvious that in the usual situation of adequately developed income-producing properties the assessor's allocation of value to the land follows determination of the over-all assessed value of the property, is not intended to be exact, and is often a rough estimate, if not indeed somewhat arbitrary. It was, accordingly, an error for Special Term to give such conclusive importance to a land value derived through an inherently inexact and unreliable procedure.

In any event, the land value derived by petitioner's expert, essentially in agreement with that of the city assessor, is far more persuasively supported by the record. Indeed, the conclusion reached by respondent's expert with regard to the land value is almost totally unsupported by probative evidence.

What emerges most clearly from the report and testimony of respondent's expert is his total failure to explain the process by which he derived the land value he attributed to the subject property from the comparable sales that he relied upon. (See *Shore Haven Apts. No. 6 v Commissioner of Fin.,* 93 AD2d 233, 236; *Matter of Stoneleigh Parkway v Assessor of Town of Eastchester,* 73 AD2d 918.) It further appears that respondent's expert, without explaining his reason for so doing, made no adjustments for location, and that through a curious, unexplained process he applied adjustments for plottage and corner influence to the subject property, but did not make such adjustments where also indicated to the values he developed with regard to his comparable sales. (See *People ex rel. Pennsylvania, N. Y. & Long Is. R. R. Co. v O'Donnel,* 130 App Div 734, 736; *Matter of Erlanger,* 206 App Div 148, mod on other grounds 237 NY 159; *People ex rel. Loeser & Co. v Goldfogle,* 249 NY 284; *Matter of Stoneleigh Parkway v Assessor of Town of Eastchester, supra.*) The city's expert appears to have almost entirely disregarded in his report and testimony the well-established principle: "Sales of

other parcels, where used as criteria in the evaluation of the subject property, need to be adjusted to differences between one another and between each of them and the subject property." (*Latham Holding Co. v State of New York,* 16 NY2d 41, 45.)

Thus, in assigning a value of $50 per square foot to the 16,800 square feet which he allocated to the 30th Street portion of the property, respondent's expert used four side street sales. Three of these sales worked out to a value below $50 per square foot. The city's expert did not explain how he adjusted the values developed in these sales to reach $50 per square foot for the subject property.

Of his four side street sales, three were located on 31st Street. Although both experts testified that land values declined going below 30th Street and increased going north of 30th Street to 34th Street, the city's expert did not make any adjustment for location, nor did he explain why he made no such adjustment. The one comparable sale of the city's expert on 30th Street, the same street on which the subject property is primarily located, disclosed a value of $34.21 per square foot. No explanation was given of the weight assigned by the city's expert to what would appear to have been the most closely comparable sale in terms of side street land values.

The city's expert's use of his Sixth Avenue sales was similarly flawed. Two involved properties north of the subject property, both with extensive footage along Sixth Avenue, one on the northwest corner of Sixth Avenue and 31st Street, and the second on the southwest corner of Sixth Avenue and 32nd Street. No adjustment was made by the expert for the apparently superior locations of these properties, nor did he apply to them adjustments based upon plottage, and corner and key influence, long accepted as standard. No explanation for the failure to make such adjustments was presented, nor was any given for applying plottage and corner adjustments to the subject property although not doing so with regard to the comparable sales which clearly invited application of the same considerations. Notably, one of the respondent's expert's Sixth Avenue sales worked out to a price per square foot of $215.84 and the second to a price per square foot of $96.57, a

disparity which illuminates the somewhat uncertain character of the allocation of land values in property assessments. The expert gave no explanation for the difference in value per square foot between his two comparable sales, nor did he explain how he adjusted them to each other in order to apply them to the subject property.

In short, the land values accepted by Special Term as a dispositive basis for confirming the assessments on the subject property appear to have been derived through a process not explained by the city's expert, and one that appears to have disregarded long-established principles of adjustment.

Pertinent here is a notable comment in a recent case: "When an expert opinion lacks factual support and is bolstered only by the expert's qualifications, it carries little probative value * * * and should be rejected * * * for it cannot be weighed intelligently." (*Shore Haven Apts. No. 6 v Commissioner of Fin., supra,* at p 236; see, also, *Matter of Stoneleigh Parkway v Assessor of Town of Eastchester, supra; Matter of Peck v Obenhoff,* 84 AD2d 633.)

The land values determined by the petitioner's expert, carefully explained in terms of accepted adjustment factors, appear to us far more reliable. It may not be without significance that these values were in essential accord with those that had been determined by the tax assessor.

Turning to the application by the respective experts of the income capitalization methods, a similar pattern is apparent. In determining the appropriate capitalization rate, the petitioner's expert first established the safe rate, which he took, in accordance with accepted procedures, to be the returns for the year in question on United States Government long-term bonds. To these he added increments for the risk factor, nonliquidity, portfolio management, and recovery of capital (1.5%, .5%, .5% and 1%, respectively). From this, he concluded that for the period 1973/74 through 1976/77 the capitalization rate was 10.25%; that for 1977/78 through 1980/81 it was 12%; and that for 1981/82 it was 15%.

The basic methodology followed by petitioner's expert appears to be an acceptable application of approved ap-

praisal methods. An approach using very similar components was recently approved in connection with proceedings relating to overlapping tax years in *Shore Haven Apts. No. 6 v Commissioner of Fin. (supra)* and was also approved by Special Term in *Matter of 6 & 8 Assoc. (Tax Comm.)* (NYLJ, March 19, 1981, p 7, col 2).

The fact that a very similar approach has been approved in recent cases is, of course, not conclusive. As was observed in *Matter of City of New York (First Elephant Estates — La Hermosa Church)* (17 AD2d 317, 324, *supra*):

"The rate of capitalization itself should be, of course, a reflection of the market rate, that is, what the investment market requires in return from a property of the age, kind, condition and location as the subject property. As such, it is a matter for proof and argument * * *

"The allocation of a greater significance to one or more factors in one case is no indication that a different allocation will not be appropriate in another case. The allocation always depends upon the presentation of facts which illuminate or dictate the greater relevance or significance of the several factors used. The ultimate criterion is which better reflects, or rather, approaches true value. In the case of income property it is which factors are most probative of the future income and future rate of return demanded by the investment market. At best, there is no precision, although precise-sounding mathematical formulas are used. At worst, there is no mystery, although there are pragmatic efforts at prognostication."

We are unable to find in the testimony of respondent's expert a persuasive rebuttal to the capitalization rates set forth in the testimony of petitioner's expert. What is presented is essentially an unexplained opinion that the appropriate capitalization rate for the years 1973 through 1978 was 8½%, and that the appropriate rate for the years 1979 through 1981 was 7½%, the only explanation given being the expert's view that an investor would have anticipated an appreciation in value during those years that would have justified paying more for the properties than current net income would have otherwise indicated. No relevant support for this opinion is given other than the circumstance, conceded by petitioner's expert, that a long-

depressed market was beginning to turn around in 1979. But this undoubted development would certainly not explain the 8½% rate fixed for the mid-1970's, a period of recession in the real estate market; and more than the expert's unsupported opinion would be required to accept a capitalization rate for the latter years that is several percentage points below the contemporaneous returns on long-term United States bonds.

Although the basic methodology of the petitioner's expert is in accord with accepted procedures and the increments described above are reasonable, a troublesome problem is presented by the application of precisely the same formula to a period beginning in 1979, during which the real estate market, as acknowledged by petitioner's expert, was emerging from a prolonged depression. It would seem reasonable to infer that this significant development would have had some impact on the capitalization rate in terms of the realistic expectations of potential buyers that income improvements would occur that would make investment in properties more secure and more likely to permit a profitable resale. The record is not helpful in permitting us to quantify the significance of the development agreed to by both experts. Nonetheless, we are inclined to think that some modification of the petitioner's expert's capitalization rate is indicated with respect to the years 1979/80, 1980/81 and 1981/82. In the absence of more precise information, we think it appropriate to reduce the capitalization rates advanced by petitioner's expert for those taxable years by 1%. (Cf. *Matter of 6 & 8 Assoc. [Tax Comm.], supra.*)

As to the remaining differences between the two experts, a remand for another trial would have been required except for petitioner's stated agreement, in an effort to avoid the expense and delay implicit in a new trial, to accept certain aspects of the city's position. We are persuaded that the issue raised with regard to the appropriateness of some of the expenses claimed is adequately resolved by an acceptance of the audit by respondent's accountants of petitioner's books and records, which eliminates all expenses which, in the view of the accountants, are "non-operating" and "non-recurring", i.e., capital improvements. And the principal remaining factual issue is

eliminated by petitioner's agreement to an adjustment of its net income by adding to the income for each year the increments calculated by the city's appraiser with regard to two disputed rentals to bring those rents up to market level. The record firmly supports an allowance of 3½% of collections for management, leasing, legal and accounting expenses.

Accordingly, the judgment of the Supreme Court, New York County (Mangan, J.), entered June 28, 1982, confirming the total assessments on 855 Sixth Avenue, Manhattan, for the subject tax years 1973/74 through 1981/82 should be modified, on the law and on the facts, to provide for a reduction of those assessments to a sum to be determined on the basis of the capitalization rates set forth by petitioner's expert, except with regard to the years 1979/80, 1980/81 and 1981/82, as to which those rates shall be reduced by 1%, and to assign to the land the values testified to by the petitioner's expert, and to further adjust net income in accordance with that set forth in this opinion.

SULLIVAN, MILONAS and ALEXANDER, JJ., concur.

Judgment, Supreme Court, New York County, entered on June 28, 1982, unanimously modified, on the law and on the facts, to provide for a reduction of certain assessments to a sum to be determined on the basis of the capitalization rates set forth by petitioner's expert, except with regard to the years 1979/80, 1980/81 and 1981/82, as to which those rates shall be reduced by 1%, and to assign to the land the values testified to by the petitioner's expert, and to further adjust net income in accordance with that set forth in this court's opinion.