STATE OF NEW JERSEY BY THE STATE HIGHWAY COM-
MISSIONER, PLAINTIFF-APPELLANT, v. JOHN C.
BURNETT, DEFENDANT-RESPONDENT.

Argued April 1, 1957—Decided May 13, 1957.

282

*Mr. John F. Crane,* Deputy Attorney-General, argued the cause for the plaintiff-appellant (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney; *Mr. William J. McCormack,* Deputy Attorney-General, on the brief).

*Mr. Irving Riker* argued the cause for the defendant-respondent (*Messrs. Riker, Emery & Danzig,* attorneys; *Mr. Waller H. Jones,* of counsel; *Mr. Dickinson R. Debevoise,* on the brief).

The opinion of the court was delivered by

BURLING, J. This is an appeal by the State of New Jersey from a jury verdict in the Superior Court, Law Division, which determined the amount of compensation to be paid for the taking of defendant's property. The property involved is to be used for a portion of the Palisades Interstate Parkway (*L.* 1933, *c.* 384, as am., *R. S.* 32:16–1 *et seq.*).

The proceedings are governed by *R. S.* 20:1–1 *et seq.* A hearing was held before condemnation commissioners, who fixed the award at $1,245,321.50. Both parties appealed from the commissioners' award and the cause was tried before a struck jury which returned a verdict of $1,585,600. The State pursued an appeal to the Superior Court, Appellate Division, and we have certified the cause prior to a review below.

The land comprises some 55 acres in the Borough of Alpine, Bergen County, between Route 9W and the Palisades Cliffs. It is nine miles north of the George Washington Bridge. The eastern border fronts upon the Palisades overlooking the Hudson River. The terrain there is wooded and rocky, and the scenic beauty of the locale makes it a most desirable residential site. In the past persons of wealth have established estates along the 12 miles stretch of the Palisades.

The defendant owner, Dr. John C. Burnett, and his wife (now deceased) occupied and started developing the property in 1920. Various structures were added from time to time as well as a variety of expensive conveniences. The design of the estate and its functional characteristics were not born of a conventional bent. Mrs. Burnett was an artist who devoted her talents to painting and sculpturing. She designed the buildings and her husband supervised the construction. After the main residence was completed in

1920 the Burnetts designed and constructed a separate dining hall and kitchen, five service buildings (grouped together in a semi-circular fashion and containing staff residences, as well as a garage, machine shop, a pump and filter room, an electric switchboard, a carpenter shop and a laboratory), a dome-shaped wooden building used as a studio, a log cabin and a swimming pool. A Japanese tea house was purchased and moved onto the property. The exterior design of many of the buildings is unusual because of its curvilinear features, sloping sides and massive rock texture. Two eminent architects produced by defendant were asked whether the structures were illustrative of any recognized architectural style or philosophy. One noted a similarity of expression with the architectural principles of several modern architects. The expert described the principle as "the fluid movement of space within the building," "not rigid squares, right angles, parallel lines one to the other." The other architect conceived that the architectural purpose of the Burnetts was to "key" the structures in with the site, and to maintain and emphasize the natural characteristics of the land itself by dispersing the uses individually, making each appear as a natural rock outcropping of the terrain. Both experts felt the design was sound from an architectural viewpoint although it did not conform to any conventional style. Truly, many of the structures were more impressionistic than colonial.

Next in presentation of expert testimony for defendant were three real estate brokers wholly familiar with the Alpine area and the real estate market prevailing in that locale. The sum of their testimony was that the uniqueness of the structures precluded an opinion on the market value of the estate because other realty which had been sold in the past was not "comparable" to defendant's property. One broker stated:

"To my knowledge I have never seen a comparable property, nor has any of my staff. I checked with my entire organization. This was because of the unusual architecture of the buildings, the most unusual construction. Many of the buildings were built like a

fortress with steel, concrete and tile, and then too there were some unorthodox buildings such as the Japanese Tea House and the Igloo, and there was another studio. The building had a stone quarry in the service area. It had a stone crusher and with a forge machine shop, pump room, carpenter shop, a room set aside for a laboratory, a large water filter over six feet high, a generating plant for direct electric current, a big tank for softening water, and of course the other buildings such as the caretaker's cottage, office, bungalow and so forth, swimming pool, and it had its own telephone system between buildings. It had three water systems and in every respect it was most unusual, and unlike any property that I have had the privilege of knowing about."

However, on cross-examination one expert acknowledged that every property "has a buyer for it at a price" and that the Burnett property was no exception. All three witnesses gave their opinion on the market value of the 55 acres as vacant land. These estimates were close and approximated an average of $1,093,000.

Defendant thereafter produced a construction engineer who estimated the reproduction cost of the structure at $1,587,700, which reduced by a depreciation allowance of $413,916 would result in a net reproduction cost of $1,173,784. The sum of the separate valuations would approximate $2,266,000.

Although the State contended that evidence attributing separate values to the structures and the land was inadmissible, the trial court thought it proper for the jury's consideration in the absence of sales of comparable property in the vicinity.

Two real estate brokers, equally experienced with the local realty market, were produced by the State. They acknowledged the unique structural quality of the premises but were of the opinion that the property would have a demand on the market. Under questioning of the trial judge one broker stated:

"Q. Were there any buyers in the market around 1953 for such an estate as the Burnett estate? A. I think so.

Q. Where would you find them other than possible the Palisades Interstate Park Commission itself for the use of the buildings, for example, for the police department, automobiles or repairs,

storage for their snow plows, and things like that, who else would buy this place? A. Your Honor, it is my opinion—Previews is a clearing house for estates and they publish a book twice a year describing estates all over the United States, and in my opinion if the Burnett estate with photographs and descriptions were published in Previews, many a buyer would probably be found who would be interested in that property, because of its location, and many of its characteristics that would have general appeal and I think that—

Q. Would the average person buy the residence, for example, to live in? A. Yes, and remodel it, put a dining room in it and put a kitchen in it so that they wouldn't have to walk in bad weather to the dining hall.

Q. Would a prospective purchaser have to tear down the building and develop it in a different way or what? A. He would probably demolish the service group because I think it is a monstrosity and serves no useful purpose to an estate of that size. Of course, you need some utility building and some maintenance building, but not on the grand and fabulous scale of this service group for an eight room house."

The same broker testified that some years ago he had two potential purchasers for the Burnett estate, but the owners were not interested. Both of these witnesses suggested that $750,000 would represent a fair market price, and when questioned about the basis for this estimate expressed the thought that there was a sufficient correlation between large estates previously sold in the area and the Burnett property to support the opinion. On the matter of comparability it was said:

"There were numerous estates sold in this area which indicated that there are buyers for estates, and every estate I ever sold was different from any other. The architectural style was different, the size of the property was different, the kinds of out buildings are different, and I don't think there is a single estate that was ever sold that had the same things on it. It is not like a development, not like the houses that we live in and own. They are all different, all built according to the whims of the owners, and when they are purchased the new owner will invariably spend more than he paid for the property to refurbish it and change it according to his desires."

On submission of the case to the jury the trial court emphasized that the core of the inquiry was just compensa-

tion and that "the landowner is entitled to receive a fair price for any use for which the land has a commercial value." The methods of proof were explained and the court stated that in view of defendant's position that it was impossible to construct a hypothetical market for the subject property through comparable sales, he had permitted testimony of the separate valuation of the structure and the land as an aid to the jury in reaching a just compensation. (The jurors were accorded a view of the premises as the initial step in the trial proceeding.) It may be noted, without attempting analysis, that the jury verdict of $1,585,600 was slightly over the average of the two extremes taken by the contestants.

The State's position on appeal is quite simply stated. Error is argued on the ground that the trial court permitted the jury to apply a test other than that of market value in determining just compensation, and that all evidence of reproduction cost and separate land value was improperly received because there was no proof that the structures "enhanced" the value of the land. A lesser involved dispute centers upon the remoteness of sales of vacant land in the immediate area which formed a basis for expert opinion.

Our task is to resolve two questions:

1—Did the trial court abuse its discretion in admitting evidence of structural reproduction costs as well as the value of the land as vacant land?

2—Did the court abuse its discretion in admitting evidence of vacant land sales which occurred from 1929–1931?

I.

The power of eminent domain is an attribute of sovereignty not created but limited by constitutional mandate. *Abbott v. Beth Israel Cemetery Ass'n of Woodbridge,* 13 *N. J.* 528, 543 (1953). The owner whose property is taken for a public use must receive *just compensation. U. S. Const., Amends.* V and XIV (*Chicago, B. & Q. R. Co. v. City of Chicago,* 166 *U. S.* 226, 17 *S. Ct.* 581, 41 *L. Ed.*

979 (1897)); *N. J. Const.* 1947, *Art.* I, *par.* 20. The problem in implementing the requirement of just compensation is to gird the term with objective standards of measurement, but at best we can only attain a measure of flexibility in the variety of circumstances that may arise. *City of Trenton v. Lenzner,* 16 *N. J.* 465, 476 (1954), *certiorari* denied 348 *U. S.* 972, 75 *S. Ct.* 534, 99 *L. Ed.* 757 (1955). There Justice Jacobs noted that these indefinite valuation concepts which breed flexibility may indeed serve the objective of justice in each particular case.

In the attempt to remain at least one step away from early common-law verdicts that were more the product of intuition than reasoned judgment, the search has been for some practical standard to measure just compensation. *Cf. United States v. Miller,* 317 *U. S.* 369, 373–374, 63 *S. Ct.* 276, 87 *L. Ed.* 336, 342 (1943). Recognizing that nearly all things may, if offered, create purchasing demand, the criterion of market value has been the gravitational pole for just compensation. *City of Trenton v. Lenzner, supra,* 16 *N. J.,* at *page* 476; *Butler Hard Rubber Co. v. City of Newark,* 61 *N. J. L.* 32 (*Sup. Ct.* 1897). And while "just compensation" has been said to require a "full and perfect equivalent," *Monongahela Navigation Co. v. United States,* 148 *U. S.* 312, 326, 13 *S. Ct.* 622, 626, 37 *L. Ed.* 463, 468 (1893)—a term which speaks more of total indemnity—the constitutional requirement is satisfied by a sum of money which fairly represents the transferable value of the property in the market place. *Olson v. United States,* 292 *U. S.* 246, 255, 54 *S. Ct.* 704, 78 *L. Ed.* 1236, 1244 (1934); *Kimball Laundry Co. v. United States,* 338 *U. S.* 1, 5, 6, 69 *S. Ct.* 1434, 93 *L. Ed.* 1765, 1771, 1772 (1949). We deal, then, in most valuation problems, in an evidential construction of a hypothetical sale between a willing and uncoerced seller and a like-minded buyer. 4 *Nichols on Eminent Domain* (*3d ed.* 1951), *sec.* 12.32, *p.* 134.

In *In re Parking Authority of Hackensack,* 30 *N. J. Super.* 534 (*App. Div.* 1954), the Appellate Division held

that admissibility of evidence of reproduction cost was essentially a matter of discretion with the trial court. The owner sought to prove the reproduction cost of several old buildings. The trial court had excluded this evidence, stating (*Id., 30 N. J. Super.,* at *page 538*):

"It is a total of the land and the building. You can't break up and say a building is worth so much, and the land is worth so much, any more than you can evaluate a tree or bush on it. That is what enhances the value of the land."

On appeal the exclusion was not viewed as an abuse of discretion because there had been no indication that a valuation based upon sales of comparable property was either impractical or impossible. (The decision draws some analogy with several older cases where separate values attributed to deposits of stone and sand, or to standing trees or topsoil, were held to be improper criteria because the property is to be valued as a whole, and natural deposits only have a value attribute to the extent that they "enhance" the value of the land. *Manda, Inc. v. Delaware L. & W. R. Co.,* 89 *N. J. L.* 327 (*E. & A.* 1916); *Ringwood Co. v. North Jersey etc. Commission,* 105 *N. J. L.* 165 (*E. & A.* 1928); *Ross v. Commissioners of Palisades Interstate Park,* 90 *N. J. L.* 461 (*Sup. Ct.* 1917)). The import of the holding seems to be this: where sale prices of "comparable" property are available it may be an abuse of discretion to allow evidence of reproduction cost; conversely, in the "absence of comparable sales to indicate comparable values," 30 *N. J. Super.,* at *page 539,* such evidence is admissible. *Cf. N. J. Highway Authority v. Johnson,* 35 *N. J. Super.* 203, 213–214 (*App. Div* 1955).

The *dictum* in *Hackensack* that evidence of reproduction costs is admissible where "comparable" sales have not been discovered in the vicinity would clearly support the defendant's position here, and especially so if we view the word "comparable" as meaning that the reference properties must be "substantially similar in conditions," *Manda v. City of Orange,* 82 *N. J. L.* 686, 688 (*E. & A.* 1912). Clearly,

there was no other estate in the vicinity whose structural features were substantially similar to the Burnett property.

It is significant that the majority precedent in this country is to admit evidence of reproduction cost even in the face of strong probative evidence of market value through sales of "comparable" property. The leading case on the point is *In re Blackwell's Island Bridge Approach*, 198 *N. Y.* 84, 91 *N. E.* 278, 279, 41 *L. R. A., N. S.*, 411 (*Ct. App.* 1910). The City of New York acquired land for a bridge approach and the condemnation commissioners had admitted testimony of the structural value of several apartment houses located on the land. The Appellate Division of the Supreme Court held such evidence to be incompetent where general evidence of market value (based upon sales of "comparable" property) was present. In reversing, the Court of Appeals stated:

"If all buildings were alike, the rule laid down by the Appellate Division would be one of convenient and universal application. It is common knowledge, however, that buildings not only differ from each other in design, arrangement, and structure, but that many which are externally similar and are situate upon adjoining lands, are essentially different in the quality and finish of the materials used and in the character of the workmanship employed upon them. It must follow that such differences contribute in varying degrees to the enhancement in the value of the land, and we can think of no way in which they can be legally proved except by resort to testimony of structural value, which is but another name for cost of reproduction, after making proper deductions for wear and tear. This may be by no means a conclusive test as to the market value of premises condemned for public use. But that is not the question at issue. The question is whether evidence of structural value is competent to show market value, when the buildings are suitable to the land. There are instances, of course, when precisely similar buildings upon identical parcels of land may have the same quotential market value just as the price of commodities like cotton, flour or potatoes is regulated by the law of supply and demand, without reference to cost of production in particular cases. When that is true, the market value may be the value of the land as enhanced by the value of the buildings, without reference to structural value. But when a building has an intrinsic value, which must be added to the value of the land in order to ascertain the value of the whole, the owner may not be able to establish his just compensation unless he is permitted to prove the value of his land as land and the value of his buildings as structures."

The Iowa Supreme Court, in displaying a similar liberality in the reception of evidence according separate values to land and improvements, noted that "the true rule seems to be to permit the proof of all the varied elements of value; that is, all the facts which the owner would properly and naturally press upon the attention of a buyer to whom he is negotiating a sale and all other facts which would naturally influence a person of ordinary prudence desiring to purchase." *Ranck v. City of Cedar Rapids,* 134 *Iowa* 563, 111 *N. W.* 1027, 1028 (*Sup. Ct.* 1907). *Nichols* points out the value of such evidence in stating:

"While it is undeniably true that market value and intrinsic value are not necessarily equivalent, proof of the latter is often competent evidence for consideration in the determination of the former. Thus, if the *property condemned has upon it a large busi-*ness block, it would certainly be material to know whether the building is of steel frame and fireproof construction, or is a cheap veneered wooden frame. The amount and value of the steel in the one case, and of the cheaper material in the other, would be an important factor in the judgment of any fair-minded witness or juror in making an estimate of the value of the property as an entirety. That is, these items are not to be considered as in themselves affording a basis or measure of recovery, but as explaining and supporting the estimates made of the value of the property as it stands." 5 *Nichols, supra, sec.* 20.2(1), *p.* 245.

And Judge Learned Hand in *United States v. City of New York,* 165 *F. 2d* 526, 529, 1 *A. L. R. 2d* 870 (2 *Cir.* 1948), characterizes the so-called "unit rule" (which would exclude opinion of separate valuation attributed to improvements and the underlying land) only as a highly important caution in using such evidence as the sole determinant, concluding that "value, especially when we are dealing with non-fungibles, is in application as impalpable a concept as can be, and we should be unwilling to circumscribe the approach to it to the opinions of experts." Accord, *United States v. Wise,* 131 *F. 2d* 851 (4 *Cir.* 1942); *Clark v. United States,* 155 *F. 2d* 157 (8 *Cir.* 1946); *Cade v. United States,* 213 *F. 2d* 138 (4 *Cir.* 1954); *Campbell v. City of New Haven,* 101 *Conn.* 173, 125 *A.* 650 (*Sup. Ct. Err.* 1924);

*State v. Styner,* 58 *Idaho* 233, 72 *P.* 2d 699 (*Sup. Ct.* 1937). See *Jahr, Eminent Domain—Valuation and Procedure, sec.* 155 (1953).

Whatever may be the scope of the term "comparability," it cannot fairly be said that the Burnett property so resembled other estates in the area that probative evidence of value might be achieved through evidence of sales of other properties. And where this is so it is everywhere held proper for the jury to consider this type evidence in assisting the determination of market value. *Joint Highway Dist. No. 9 v. Ocean Shore R. Co.,* 128 *Cal. App.* 743, 18 *P.* 2d 413 (*D. Ct. App.* 1933), and *Hall v. City of Providence,* 45 *R. I.* 167, 121 *A.* 66 (*Sup. Ct.* 1923), illustrate this point in states which appear to reject the majority rule in the usual case where value opinions are grounded upon "comparable" sales. *Cf. Clark v. United States, supra; Newton Girl Scout Council v. Mass. Turnpike Auth.,* 138 *N. E.* 2d 769 (*Mass. Sup. Jud. Ct.* 1956).

It is unnecessary in the case before us to decide whether an owner of condemned property which is barren of value under any reasonable hypothesis would be entitled to compensation for the taking. See *State, by State Road Comm. v. Boyd,* 129 *W. Va.* 715, 41 *S. E.* 2d 665 (*Sup. Ct. App.* 1947); *Dept. of Public Works & Buildings v. Filkins,* 411 *Ill.* 304, 104 *N. E.* 2d 214 (*Sup. Ct.* 1952). The State argues that this is such a case because the defendant has not proven that the structures here are well adapted to the land. Annotation, 172 *A. L. R.* 236, 244. The burden may rightly be upon the landowner to demonstrate that the property has some value, leaving the determination of this question to the jury. *Cf.* 2 *Orgel, supra, sec.* 191, *pp.* 17, 24. Here there was proof submitted by the architects that the property was fit for residential use, and the State's own experts attributed a market value to the estate, being of the opinion that a purchaser could readily be found for the property. The State has not taken the position that Dr. Burnett is not entitled to compensation solely upon the value of the property as vacant land and it therefore is in

no position to urge that the improvements on the property are totally void of any value.

We conclude, then, that the trial judge did not abuse his discretion in admitting evidence of reproduction costs of the improvements which reflected physical depreciation, as well as the expert opinion assigning a value to the property as vacant land. (The construction engineer who offered his opinion on reproduction costs did not take into consideration any element of functional obsolescence, but the State did not take exception to the opinion on this ground and we see no reversible error. *Cf. Hickey v. United States,* 208 *F.* 2d 269, 279 (3 *Cir.* 1953), *certiorari* denied 347 *U. S.* 919, 74 *S. Ct.* 519, 98 *L. Ed.* 1074 (1954)).

## II.

In submitting opinion evidence of reproduction costs of the improvements on the Burnett estate the defendant also called upon three real estate brokers to register a market value opinion upon the 55 acres as vacant land. The opinions ranged from $18,500 to $21,066 per acre and were based upon sales of unimproved cliff property occurring during the years of 1928 through 1931. The State argues that the remoteness in time made these sales an "unsafe jury guide."

Defendant's experts, however, testified that following the enactment of the legislation authorizing the Palisades Interstate Parkway (*L.* 1933, *c.* 384, which bestowed the power of condemnation over land lying within the westerly 1,000 feet from the edge of the Palisades) public interest in the purchase of cliff property dropped off. The record indicates that prior to this time Mr. John D. Rockefeller, Jr., was buying cliff property through agents to donate to the State for the purpose of building a scenic highway. When word of this became known there was a natural hesitancy in acquiring cliff property for large residential sites.

We do not find any abuse of discretion on the part of the trial court in permitting the value opinions. In the

search for evidence having a ring of probative value these matters of remoteness are best judged by the trial court as the case develops before him. *Montclair R. R. Co. v. Benson,* 36 *N. J. L.* 557 (*E. & A.* 1873); *Brown v. New Jersey Shore Line R. R. Co.,* 76 *N. J. L.* 795 (*E. & A.* 1908); *New Jersey Highway Authority v. Johnson,* 35 *N. J. Super.* 203, 214 (*App. Div.* 1955). Values which have been depressed by the cloud of condemnation are said to be untrustworthy in some instances. 4 *Nichols, supra, sec.* 12.3151(2), *p.* 126. On the other hand our courts have, in the incessant search for objective factors of measurement, permitted evidence of private sales to parties having the power to condemn. *Curley v. Jersey City,* 83 *N. J. L.* 760 (*E. & A.* 1912). From the holding in *Curley* the State contends that the power to condemn is not a depreciating factor. But the *Curley* case deals only with admissibility and not exclusion. The holding does not *forbid* the use of sales of property transferred on an unhampered market.

The State was not restricted in introducing evidence of scattered sales of cliff property following the enactment of the parkway legislation. We see no manifest prejudice in defendant's presentation.

█ Additional errors are assigned to portions of the charge of the trial judge and his denial of several requested instructions. In the light of the questions and conclusions stated above, these objections lose the merit that might otherwise be advanced. Although a more extensive cautionary instruction might have been given to the value criteria adduced (consider *e. g., United States v. Wise, supra*), the charge was as fair as could be under the difficult circumstances of this case. The matter of just compensation was properly grounded by the trial judge in market value, and the controverted evidence concerning reproduction cost reflecting physical depreciation was directed by the judge to be used by the jury in arriving thereat.

The judgment is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING, JACOBS and WEINTRAUB—6.

*For reversal*—Justice OLIPHANT—1.