289 N.J. Super. 381 (1996)
673 A.2d 1360
JERSEY CITY REDEVELOPMENT AGENCY, A BODY CORPORATE AND POLITIC OF THE STATE OF NEW JERSEY, AND NEWPORT CITY DEVELOPMENT COMPANY, A NEW JERSEY GENERAL PARTNERSHIP, PLAINTIFFS/APPELLANTS/CROSS-RESPONDENTS,
v.
CLEAN-O-MAT CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY, AND THE FOURTEEN FLORENCE STREET CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS/RESPONDENTS/CROSS-APPELLANTS, AND STATE OF NEW JERSEY; CITY OF JERSEY CITY, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY; JERSEY CITY SEWERAGE AUTHORITY, A BODY CORPORATE AND POLITIC OF THE STATE OF NEW JERSEY; THE TRUST COMPANY OF NEW JERSEY, A BANKING CORPORATION OF THE STATE OF NEW JERSEY; MECCA & SONS TRUCKING CO. (A/K/A MECCA TRUCKING), A NEW JERSEY CORPORATION; FOURTEEN FLORENCE STREET WAREHOUSE CORPORATION, A NEW JERSEY CORPORATION; AND COCOA GRINDING CO. OF AMERICA, A NEW JERSEY CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 19, 1996.
Decided April 11, 1996.
*387 Before Judges MICHELS, BAIME and VILLANUEVA.
John J. Curley argued the cause for appellant/cross-respondent Jersey City Redevelopment Agency (Curley & Sciarra, attorneys; Mr. Curley, of counsel and on the brief).
Sheldon M. Finkelstein argued the cause for appellant/cross-respondent Newport Associates Development Company (Hannoch Weisman, attorneys; Mr. Finkelstein, of counsel and on the brief; Gerald F. Spada, on the brief).
Samuel D. Bornstein argued the cause for respondents/cross-appellants Clean-O-Mat Corporation and The Fourteen Florence Street Corporation.
The opinion of the court was delivered by BAIME, J.A.D.
These appeals and cross-appeals have their genesis in a condemnation action commenced by Jersey City Redevelopment Agency (JCRA) against Clean-O-Mat Corporation (COM) and The Fourteen Florence Street Corporation (Florence). As part of its plan to rehabilitate blighted areas along its northern waterfront, Jersey City authorized Newport Associates Development Company (Newport) to acquire properties within the boundaries of the project. With respect to properties Newport could not purchase, Jersey City authorized JCRA to institute condemnation proceedings. Newport thus joined JCRA's actions against COM and Florence. Following initial skirmishes, the parties entered into a settlement agreement that was incorporated in a consent judgment. Unfortunately, *388 the consent judgment was not the end, nor the beginning of the end, nor even the end of the beginning of the parties' disputes. Instead, it spawned an explosion of fragmented and protracted litigation over which four different judges presided and which occupies literally thousands of pages of transcript. Despite the diversity of the claims and counterclaims advanced, we discern two common threads  the valuation of COM's property and the claims among the parties concerning the transfer of the owners' interests to Newport and JCRA. A jury fixed just compensation for the taking of COM's property in the amount of $2,200,000. COM was also awarded approximately $175,000 in relocation expenses and prejudgment interest at the judgment rate rather than at its mortgage rate. However, its claim for counsel fees was denied. Newport lost its action to compel Florence to specifically perform extensive renovations required by the consent judgment. Newport was also denied damages arising from COM's delay in vacating its property but was granted attorneys' fees expended in pursuing this claim. The parties filed separate appeals and cross-appeals, which we now consolidate. We affirm the judgments and orders from which these appeals and cross-appeals are taken with the exception of the order awarding Newport counsel fees respecting its unsuccessful claim for delay damages.

I.
Although this case has a lengthy and tortured procedural history, we recite only those facts critical to our disposition of the issues raised.
This litigation concerns two properties included in Jersey City's northern waterfront redevelopment project known as "Newport City." The properties in question were COM's, located at 606 Henderson Street in Jersey City, and Florence's, located at 574-88 Henderson Street. Jerry Mecca was the sole shareholder of both COM and Florence. Jersey City's governing body defined the borders of the redevelopment area and passed an ordinance containing a redevelopment plan, which the developer, Newport, *389 would follow. As we noted, the plan called for Newport to purchase all necessary property interests within the project area, but the City authorized JCRA to acquire through condemnation those properties Newport could not otherwise obtain.
On March 8, 1985, JCRA filed a condemnation complaint against COM, setting the value of COM's property at $500,000, reflecting $34,550 for the land and $465,450 for the "improvements." The complaint named Florence as a tenant in COM's property, as well as other defendants not involved in this appeal. On the same day, JCRA filed a separate condemnation complaint against Florence, fixing the value of Florence's property at $1,200,000 based on a land value of $115,000 and improvements worth $1,085,000. COM and Florence answered jointly, alleging that JCRA had engaged in various illegalities and conspiracies, had abused its authority by including their properties in the redevelopment project, and had failed to negotiate in good faith as required by law.
On November 4, 1987, the parties executed a settlement agreement which was incorporated in a consent judgment. The agreement declared that certain significant renovations to the Florence structures and grounds would make the property compatible with the redevelopment plan, thus obviating the need for condemnation. Florence was to submit detailed plans and specifications to Newport for its review. Upon Newport's approval, Florence was to complete the renovations in accordance with the plans. Florence also agreed to maintain the buildings as a warehouse for a ten year period and not to lease them without Newport's consent. Finally, it was agreed that trial of the condemnation complaint would be held in abeyance for six to nine months, during which time Florence was to make "substantial progress" in performing the renovations. If "substantial progress" was not made within this period, or if the renovations were not completed within two years, JCRA was authorized to condemn the property and transfer it to Newport.
The future of the COM property was also contingent, but in a different way. COM was required to "deliver possession of the *390 [property], free of debris and in good order" to Newport by January 15, 1988. COM could extend that date by two months upon the condition that it cooperate with Newport in determining whether Newport's contiguous building could be demolished without unreasonably affecting occupancy of COM's building. The parties were not confident of that possibility, however, as evidenced by the fact that valuation of the COM property was to "forthwith proceed to trial."
It soon became apparent that the settlement agreement was merely a lull in the gathering storm, a false armistice between the warring parties. In May 1988, Newport moved to enforce the agreement. Following an evidentiary hearing, the Law Division rendered an oral opinion in which it found that COM had "willfully" failed to vacate its property and that Florence had failed to submit construction plans and specifications as required by the consent judgment. The court ordered COM to vacate its property within five days and directed Florence to submit the required renovation plans within twenty days.
Both COM and Florence moved for reconsideration. Following hearings on that motion, the parties entered into a consent order on July 29, 1988. The order required COM to deliver possession of its property to Newport in "broom clean condition" by September 1, 1988. Newport was to be awarded $10,000 for each day COM failed to "deliver actual possession of the premises and building." The order further provided that Newport's claim for damages arising from COM's prior failure to vacate was to be tried by another judge. Under the order, COM agreed to accept $119,200 from JCRA for relocation expenses and to submit any further disputes regarding "loading costs" for resolution by administrative proceedings pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Uniform Relocation Act).
On September 1, 1988, COM physically vacated its premises, and on September 7, 1988, Newport received a deed to the property from JCRA. However, on September 8, 1988, Jersey *391 City's municipal council approved a resolution revising the redevelopment plan by removing COM's and Florence's properties as well as several others from the redevelopment area. On September 9, 1988, the council instructed Jersey City's construction officer not to issue "any demolition or other permits related to" the properties that might be eliminated from the project, including those belonging to COM and Florence. That same day, defendants' attorney sent a letter to Public Service Electric & Gas, advising it to "contact [its] legal department before attempting to remove or alter" the utility connections to either the COM or Florence buildings. On September 22, 1988, the council adopted an ordinance eliminating COM's and Florence's properties from the redevelopment project.
Newport then filed a motion with the Law Division seeking to invalidate the ordinance revising the redevelopment plan and to hold COM, Florence, and Jersey City in contempt. The court did not immediately act upon these applications but instead directed Jersey City's building inspector to "grant or deny Newport's application for a demolition permit ... on or before 4:00 p.m. on October 5, 1988." Appeals to this court and the Supreme Court were rejected on October 7, 1988, and demolition of COM's building began that day. Thereafter, the Law Division invalidated Jersey City's ordinance revising the redevelopment plan on the grounds that it conflicted with the consent judgment entered on November 4, 1987, and was not enacted in accordance with statutorily mandated procedures.
It will be recalled that the July 1988 consent order reserved Newport's right to damages based upon COM's failure to vacate its property as required by the November 1987 consent judgment. The trial on that issue was conducted in January 1990. We need not describe the evidence in detail. Suffice it to say, Newport's project manager testified that as a result of COM's delay the development could not proceed as planned, and demolition of COM's neighboring building, which shared a common wall with COM's building, had to be accomplished in pieces rather than by a *392 wrecking ball, which he testified "is the least expensive and the quickest way." He further asserted that other design and construction changes also became necessary. In contrast, COM's expert testified that, although demolition costs might have increased because of COM's delay in delivering possession of the premises, Newport was not otherwise inconvenienced in a substantial way. Mecca testified that he was not involved in introducing the ordinance to revise the redevelopment plan and took no improper action to persuade the Jersey City council to eliminate COM's and Florence's properties from the project, although he conceded that he supported the ordinance and made several members of the council aware of his position.
The Law Division denied Newport's claim for delay damages, finding that the actual costs attributable to COM's failure to vacate the property had not been established. The court further denied Newport's claim for liquidated damages under the July 1988 consent order. The court noted that COM's post-surrender litigation concerning Jersey City's project revision ordinance was not "without some basis," and, therefore, there was no sound reason to impose the consent order's $10,000 per-day liquidated damages provision. Notwithstanding its denial of the damages claims, the court granted Newport's application for counsel fees in the amount of $125,525.
Other issues were later raised relating to the July 1988 consent order. We have no occasion to recount the Byzantine maneuverings of the parties or the twists and turns in the court's disposition of many of these issues. It is enough to say that the court increased COM's recovery of relocation expenses beyond the $119,200 awarded in the consent order and denied Newport's request for specific performance of Florence's obligation to make the renovations called for by the 1987 agreement. Relocation expenses in the sum of $175,406 were granted to COM in accordance with an administrative decision that had been rendered under the Uniform Relocation Act.
*393 We next describe the condemnation proceedings against COM. On August 10, 1990, the Law Division appointed commissioners to determine the value of COM's property. In December 1992, the commissioners issued their report valuing COM's "lands and premises" at $1,455,000. Both JCRA and COM appealed the award to the Law Division.
The trial was conducted in March 1994. The parties presented appraisal reports as well as expert testimony and agreed that the highest and best use of the building was as a refrigerated warehouse. Three approaches to determining the value of the land and building were examined by the expert witnesses  "capitalization of income," "summation or reproduction cost," and "comparable sales." The real estate appraisal experts for each side agreed that there were no comparable sales of similarly improved buildings, i.e., no sales of refrigerated warehouse facilities. For this reason, neither appraisal expert relied upon the comparable sales approach to determine the overall value of the property. Instead, each relied upon the income capitalization and reproduction cost approaches to value. Utilizing the income capitalization and reproduction cost approaches, JCRA contended that the property's fair market value as of the date of the taking was $1,450,000. COM asserted that the fair market value as of the taking was $2,850,000. Thus, the dispute was over a difference in value of $1,400,000. For the purpose of these appeals and cross-appeals, we need discuss only the evidence dealing with the "summation or reproduction cost" approach.
Joseph Rusciano, a professional engineer, testified as an expert for JCRA. He testified about his report on the value of the COM property, which he determined by "reproduction cost new" as of March 1985, the date of taking. He explained that reproduction cost assumed a perfect duplication of the building in design and materials, plus construction-related expenses. Rusciano worked from the original building plans and inspected the structure to verify that the designs had been followed. Once he had computed a figure for the value of the building, he consulted a real estate *394 appraiser who "adjusted [the] value upward for entrepreneurial return" and "then depreciated [the] building because of physical and functional obsolescence...." The total value of the property was then determined by adding the adjusted figure for the value of the building to the value of the land.
Rusciano emphasized that the building had only one interior stairway, a steel spiral staircase that was not sectioned off from the rest of the interior and was not "fire rated." The witness testified that the structure would not satisfy the building codes in effect in March 1985, which required two enclosed, straight stairways at opposite ends of the building. The codes also would have required toilet facilities and the attendant sinks, plumbing, and sanitary sewer connection, all of which the building lacked.
William Stack, a real estate appraiser, also testified for JCRA. Stack explained that under the reproduction cost approach, after determining the value of the land and the cost of rebuilding the property "in exactly the same way as it existed or was originally constructed at whatever time," the appraiser would subtract for depreciation and obsolescence. The witness observed that obsolescence may be functional, meaning that it is related to the building itself and possibly curable, or economic, meaning that some outside factor eliminates all demand for the service in question. The absence of toilet facilities and other features required by current codes was considered a curable aspect of functional obsolescence, but the fact that the building was four stories, when the state of the art for refrigerated warehouses was single-story construction, was considered an incurable functional obsolescence. Stack noted that a decrease in the building's value due to functional obsolescence is a matter of "opinion." Based primarily on his view that the structure of the building contained an incurable functional obsolescence, Stack reduced the "value" of COM's building by twenty percent. Stack also found a depreciation factor of 31.25 percent. Utilizing Rusciano's itemization of costs, increasing it by the value of paving on the site and by ten percent for "entrepreneur's profit," and reducing the total by *395 51.25 percent, Stack estimated that the fair market value for COM's building was $1,314,400. To this amount, Stack added $91,000, which he believed to be the fair value of the land based on comparable sales. Stack concluded that the property's total fair market value as of March 1985 was $1,405,400.
Philip Falcone, a professional engineer, testified for COM. He essentially agreed with Rusciano's methodology in determining reproduction cost. However, over JCRA's vigorous objection, Falcone also included in his reproduction cost valuation "certain items which would allow the building to comply with [the] code" in effect in 1985. Those items included a "pre-action fire sprinkler" for $115,011, a locker and toilet room with plumbing for $14,350, two fire-escape stairways for $29,400, and emergency lights in those stairways for $1,520. The total cost was $160,281. Falcone's total reconstruction cost was $3,337,481, plus 10% for general contractor overhead and profit, and 5.6% of the cost-plus-profit for the fees of an architect and an engineer. The final figure was $3,876,818.
Other "add-ons" which Falcone conceded on cross-examination were necessary to cure items of arguable functional obsolescence included $34,288 for fireproofing columns and beams, $2,400 for loading dock bumpers, and $11,125 for doors that were power-operated instead of manual. The materials-and-labor cost of adding those items raised the cost of meeting the 1985 code from $160,281 to $208,094. The witness noted that with a location adjustment increase, a contractor's profit, and a higher architect's and engineer's fee for alterations, the additional reproduction costs would total "about a quarter of a million dollars."
Stanley Jay, a real estate appraiser, also testified for COM. Based on the building's condition and functionality, Jay calculated a depreciation factor of thirty percent. Jay noted that he subtracted only physical depreciation, whereas Stack subtracted both physical depreciation and functional obsolescence. Jay added that he did not find any functional or economic obsolescence, given the building's continuing serviceability and its "strategic location." *396 He also did not subtract the cost of adding the items that a building constructed in 1985 would have needed to meet the building codes then in effect. Applying the thirty percent depreciation factor to Falcone's reproduction cost estimate of $3,876,818 which, as we noted, included the cost of some (but not all) items necessary to satisfy current codes, Jay arrived at a figure of $2,713,772. From that amount, Jay deducted the cost of installing state-of-the-art freezer equipment and of tenant retrofit, thus appraising the fair market value of the building at $2,580,320. With a land value of $285,000, Jay's final valuation figure was $2,865,320, which he rounded down to $2,850,000.
As we noted at the outset of our opinion, the jury returned a verdict of $2,200,000. Following the denial of motions for a new trial and a hearing to determine appropriate prejudgment interest, the parties filed these appeals and cross-appeals.

II.
We first consider JCRA's appeal and COM's cross-appeal from the condemnation judgment. In the principal appeal, JCRA argues that the Law Division erred by admitting evidence relating to the cost of features necessary to comply with current codes. JCRA also contends that the court improperly denied its motion to set aside the jury verdict. We examine these issues seriatim.
While we agree with JCRA that COM's reproduction cost evidence was unsound in part, we find no error capable of producing an unjust result. We begin with the constitutional principle that an owner whose property is taken for a public use must receive just compensation. State v. Silver, 92 N.J. 507, 513-14, 457 A.2d 463 (1983); State v. Gorga, 26 N.J. 113, 115, 138 A.2d 833 (1958); State v. Burnett, 24 N.J. 280, 287, 131 A.2d 765 (1957). The measure of just compensation is "`the fair market value of the property as of the date of the taking, determined by what a willing buyer and a willing seller would agree to, neither being under any compulsion to act.'" State v. Caoili, 135 N.J. 252, 260, 639 A.2d *397 275 (1994) (quoting State v. Silver, 92 N.J. at 513, 457 A.2d 463). "It is the `value that would be assigned to the acquired property by knowledgeable parties freely negotiating for its sale under normal market conditions based on all surrounding circumstances at the time of the taking.'" Ibid. (quoting State v. Silver, 92 N.J. at 514, 457 A.2d 463).
"Recognizing that nearly all things may, if offered, create purchasing demand, the criterion of market value has been the gravitational pole for just compensation." State v. Burnett, 24 N.J. at 288, 131 A.2d 765. While just compensation has been said to require a "full and perfect equivalent for the property taken," Monongahela Nav. Co. v. United States, 148 U.S. 312, 326, 13 S.Ct. 622, 626, 37 L.Ed. 463, 468 (1893), this does not necessarily equate to total indemnity for the owner's loss because often the value to the owner differs from the value to the purchaser. City of Trenton v. Lenzner, 16 N.J. 465, 476, 109 A.2d 409 (1954), cert. denied, 348 U.S. 972, 75 S.Ct. 534, 99 L.Ed. 757 (1955). Instead, "the constitutional requirement is satisfied by a sum of money which fairly represents the transferable value of the property in the market place." State v. Burnett, 24 N.J. at 288, 131 A.2d 765. "We deal, then, in most valuation problems, in an evidential construction of a hypothetical sale between a willing and uncoerced seller and a like-minded buyer." Ibid.
"The various formulas fashioned to determine fair market value in a condemnation case attempt to ascertain the value that would be assigned to the acquired property by knowledgeable parties freely negotiating for its sale under normal market conditions...." State v. Silver, 92 N.J. at 514, 457 A.2d 463. In light of the fluid and complex nature of market conditions, our courts "`have shown considerable liberality in admitting evidence of market value, particularly in terms of the highest and best use of the subject property.'" State v. Caoili, 135 N.J. at 261, 639 A.2d 275 (quoting State v. Silver, 92 N.J. at 515, 457 A.2d 463).
*398 At least where comparable sales to indicate comparable values are absent, evidence of reproduction cost is admissible. State v. Burnett, 24 N.J. at 289, 131 A.2d 765; see also In re Parking Auth. of Hackensack, 30 N.J. Super. 534, 539, 105 A.2d 440 (App.Div. 1954); cf. New Jersey Highway Auth. v. Johnson, 35 N.J. Super. 203, 213-14, 113 A.2d 831 (App.Div. 1955). Stated somewhat differently, "[i]f there is economic justification for the present reproduction of ... a structure on the land it may fairly be supposed that a prospective purchaser would take the factor of cost of reproduction (less depreciation and obsolescence) into consideration in deciding what to pay [for the property]." New Jersey Highway Auth. v. Ackerson, 73 N.J. Super. 183, 185, 179 A.2d 521 (App.Div. 1962); see also State v. Willett Holding Co., 62 N.J. 59, 62, 298 A.2d 69 (1972).
This much conceded, the reproduction cost approach is only one of a variety of methods designed to determine the transferable value of the property in the marketplace. See State v. Caoili, 135 N.J. at 270-71, 639 A.2d 275; State v. Burnett, 24 N.J. at 288-89, 131 A.2d 765. Mere citation of the reproduction cost approach does not open the door to admission of evidence pertaining to all expenses necessary to duplicate the condemned building at the time of the taking. In the context of the facts here, it cannot fairly be argued that the condemning authority was bound to expend public monies to indemnify the property owner for features the building did not have. To the contrary, costs reasonably necessary to comply with current building codes would tend to reduce the value of the building in the eyes of a prospective purchaser, not increase it. Indeed, the cost of reproduction necessarily "embod[ies] all of the deficiencies, superadequacies, and obsolescence of the subject building." American Institute of Real Estate Appraisers, The Dictionary of Real Estate Appraisal 254 (2nd ed. 1989). We thus have said, albeit in another context, that functional obsolescence in the form of outmoded characteristics associated with age or a failure to keep pace with advancing technology diminishes market value and must be deducted from *399 reproduction cost. N.J. Highway Auth. v. Ackerson, 73 N.J. Super. at 185, 179 A.2d 521; see also Bostian v. Franklin State Bank, 167 N.J. Super. 564, 567, 401 A.2d 549 (App.Div. 1979).
To that extent, we find the testimony of COM's experts to be substantially flawed. We, nevertheless, discern no prejudice to JCRA arising from this deficiency. When COM first introduced evidence of the costs necessary to bring its building into compliance with current building codes, JCRA's attorney interposed a timely objection. The court initially indicated that it was "inclined" to exclude the evidence. However, JCRA's lawyer noted that "[t]hese [cost] items [were] not out of the case," because he intended to cross-examine COM's witnesses and present additional evidence respecting functional obsolescence. More specifically, JCRA's attorney stated that these cost items were "important," because "they ha[d] to be deducted from [the] value [of the building] as curable ... obsolescence." The court then decided to admit the evidence subject to a limiting instruction to be given at the conclusion of the case. As we noted in our recital of the facts, JCRA's experts described the concept of functional obsolescence in considerable detail. At the charge conference, JCRA's attorney requested an instruction on the effect of functional obsolescence on the value of a structure. In accordance with this request, the court later charged the jury that "[t]he cost of reproduction is what it cost[s] to build a similar structure less depreciation and obsolescence." JCRA's attorney noted that he was "[a]bsolutely" satisfied with this instruction.
Perhaps in retrospect it would have been preferable had the court given a more particularized charge pertaining to the costs of complying with current codes and how they were to be considered in determining market value. However, we are satisfied that the instruction as given conveyed the correct legal principle and sufficiently alerted the jury to the problem. We merely add it may be fair to infer from the failure of counsel to object to the instruction that in the context of the trial the error he now perceives was actually of no moment.
*400 JCRA's contention that the court incorrectly denied its motion for a new trial does not require extended discussion. The trial court is obliged to grant such a motion only "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a). Our scope of review is essentially the same. R. 2:10-1. We recognize that some of the expert testimony presented by COM might have been mistaken. We acknowledge, for example, that Jay appears to have overstated the amount of refrigerated space in COM's building. It is nonetheless abundantly plain that the jury verdict did not constitute a manifest denial of justice.
We now turn to the issues raised in COM's cross-appeal. Although phrasing its claims in a variety of ways, COM contends that it was constitutionally entitled to prejudgment interest at the mortgage rate  one percent above prime  rather than the judgment rate, and to counsel fees. We reject both arguments.
Initially, we acknowledge that interest is "a requirement of constitutional magnitude where the actual taking of the property is not contemporaneous with payment...." Township of Wayne v. Cassatly, 137 N.J. Super. 464, 471, 349 A.2d 545 (App.Div. 1975), certif. denied, 70 N.J. 137, 358 A.2d 184 (1976); see also State v. Seaway, Inc., 46 N.J. 376, 381, 217 A.2d 313 (1966); New Jersey Highway Auth. v. Ellis, 24 N.J. 1, 7, 130 A.2d 601 (1957). This right has been implemented by statute, N.J.S.A. 20:3-32, which requires the judge, rather than the jury, to fix the amount of interest whenever the parties are unable to agree. Ibid.; see also N.J.S.A. 20:3-31. Where, as here, the action has been pending for a substantial period of time during which the level of interest rates has been a changing phenomenon, we have mandated plenary hearings for the presentation of expert evidence as to the prevailing commercial and legal rates of interest. Township of Wayne v. Cassatly, 137 N.J. Super. at 474, 349 A.2d 545.
Pursuant to that mandate, a hearing was conducted in this case. Although COM presented expert testimony concerning *401 the rates of return available to a prudent investor, we find no abuse of the Law Division's discretion in relying on the rates provided by R. 4:42-11. The principle of restoring the condemnee to its position on the date of the taking recognizes the time value of money as a general economic fact. It does not prevent the trial court from applying the legal judgment rates. We discern no error requiring our intervention.
Equally without merit is COM's claim that the Law Division erred by denying its application for attorneys' fees. We find no basis for COM's contention that attorneys' fees are constitutionally compelled as an element of just compensation. "[I]ndirect costs to the property owner caused by the taking of his land" generally are not included in determining just compensation, and, thus, "`[a]ttorneys' fees and expenses are not embraced within'" that term. United States v. Bodcaw Co., 440 U.S. 202, 203, 99 S.Ct. 1066, 1066-67, 59 L.Ed.2d 257, 259 (1979) (quoting Dohany v. Rogers, 281 U.S. 362, 368, 50 S.Ct. 299, 302, 74 L.Ed. 904 (1930)). Perhaps, it would be fair or efficient to compensate a land owner for all costs he or she incurs as a result of a condemnation action, but the United States Supreme Court has said that "such compensation is a matter of legislative grace rather than constitutional command." Id. at 204, 99 S.Ct. at 1067, 59 L.Ed.2d at 260. We know of no statute or rule providing for the allowance of attorneys' fees in condemnation cases. See R. 4:42-9. Absent express authorization, we see nothing in this case requiring us to engraft an exception to the general principle that "sound judicial administration [is] best ... advanced by having each litigant bear his own counsel fee...." Gerhardt v. Continental Ins. Cos., 48 N.J. 291, 301, 225 A.2d 328 (1966); see also McGuire v. City of Jersey City, 125 N.J. 310, 326, 593 A.2d 309 (1991).

III.
We next address the questions raised in Newport's appeal and defendants' cross-appeals from the precondemnation orders we described in our recitation of the facts. As noted earlier, we *402 uphold all of the Law Division's orders except that allowing Newport counsel fees.

A.
We reject Newport's contention that the Law Division erred by denying its claim for delay damages. Newport's project manager testified that COM's delay forced Newport to "deconstruct" rather than "demolish" the adjacent building, to build an extra, temporary exterior wall on the partially constructed strip shopping center, to install temporary curbing, a sidewalk and two grades of paving, to construct a temporary sanitary sewer and two temporary storm sewers, and to make other alterations of its design plan. However, his testimony was devoid of any itemization of specific expenses. In common parlance, nothing in the record linked the items described by the project manager to specific dollar amounts.
Although Newport did introduce through the project manager an "estimate" of these incurred costs totalling $150,793 and accompanied by various documents, we note that upon receiving the estimate into evidence the trial judge expressed "reservation" about its probative weight. Apparently, the judge determined upon further reflection that the estimate was insufficiently supported to provide much guidance in ascertaining the quantum of increased costs incurred by Newport. We will not second-guess this determination. While we acknowledge that where a breach of a binding agreement has been committed, "`and it is certain that damages have resulted, mere uncertainty as to the amount will not preclude recovery,'" Wolpaw v. General Accident Ins. Co., 272 N.J. Super. 41, 46, 639 A.2d 338 (App.Div.) (quoting Kozlowski v. Kozlowski, 80 N.J. 378, 388, 403 A.2d 902 (1979)), certif. denied, 137 N.J. 316, 645 A.2d 143 (1994), it is also well settled that the evidence presented must afford "`a basis for estimating damages with some reasonable degree of certainty....'" American Sanitary Sales Co. v. State, 178 N.J. Super. 429, 435, 429 A.2d 403 (App.Div.) (quoting Paolicelli v. Wojciechowski, 132 N.J. Super. *403 274, 278-79, 333 A.2d 532 (App.Div.), certif. denied, 68 N.J. 153, 343 A.2d 441 (1975)), certif. denied, 87 N.J. 420, 434 A.2d 1094 (1981). Our independent review of the oral and documentary evidence submitted by Newport leads us to agree with the trial judge that Newport failed to provide the basis for a reliable estimate of the increased costs it was required to pay as a result of COM's tardy departure from the premises. We thus perceive ample support in the record for the court's conclusion that Newport failed to establish actual costs incurred by reason of COM's delay in vacating its building. Meshinsky v. Nichols Yacht Sales, 110 N.J. 464, 475, 541 A.2d 1063 (1988); Rova Farms Resort v. Investors Ins. Co. of Am., 65 N.J. 474, 483-84, 323 A.2d 495 (1974).

B.
More troublesome is the court's finding that the liquidated damages provision contained in the July 29, 1988 consent order was inapplicable because, at least to some extent, COM was justified in failing to vacate its property on a timely basis. As we understand the court's decision, the judge concluded that the parties had not intended the damages provision to encompass delays caused by litigation grounded in a plausible understanding of the changing conditions. We cannot say that the court's conclusion was "`so wholly unsupportable as to result in a denial of justice.'" Meshinsky v. Nichols Yacht Sales, 110 N.J. at 475, 541 A.2d 1063 (quoting Rova Farms Resort v. Investors Ins. Co. of Am., 65 N.J. at 483-84, 323 A.2d 495).

C.
We are unpersuaded by Newport's argument that the court awarded excessive relocation expenses. While it is true that the consent order provided only $119,200 for relocation and loading costs, it expressly provided that any further dispute was to be resolved by an administrative hearing under the Uniform Relocation Act. Although the truncated record is not entirely informative, it appears that additional relocation costs were awarded *404 under the Uniform Relocation Act following an administrative hearing. The court's subsequent award of $175,406 encompassed the additional relocation expenses granted. We perceive no repudiation of the prior consent order.

D.
We find no sound basis to disturb the court's denial of Newport's claim for specific performance of Florence's agreement to renovate its building. We note that the November 1987 consent judgment did not refer to specific performance as a remedy in the event Florence failed to perform. The judgment required Florence to submit plans and make renovations, and provided that if Florence defaulted in its obligations, JCRA would condemn the property. More importantly, monetary damages, if demanded, would have been adequate to compensate Newport for Florence's alleged breach. The principle underlying the specific performance remedy is equity's jurisdiction to grant relief where monetary damages would not make the non-breaching party whole. See Dover Shopping Center v. Cushman's Sons, Inc., 63 N.J. Super. 384, 394, 164 A.2d 785 (App.Div. 1960); Centex Homes Corp. v. Boag, 128 N.J. Super. 385, 389, 320 A.2d 194 (Ch.Div. 1974). We recognize that there may be special considerations warranting specific performance of a consent judgment, see generally R. 1:10-3, and that there are strong public policy considerations favoring enforcement of settlement agreements. See, e.g., Pascarella v. Bruck, 190 N.J. Super. 118, 124-25, 462 A.2d 186 (App.Div.), certif. denied, 94 N.J. 600, 468 A.2d 233 (1983). Here, however, the renovations called for by the consent judgment had no especially unique qualities. Damages resulting from the alleged breach were readily measurable. We discern no compelling reasons for a grant of specific performance under these circumstances. In addition, we note that, in light of the highly disputatious nature of the parties' relationship and the fractious manner in which this litigation was conducted, a grant of specific performance would likely require near constant judicial supervision to *405 ensure the renovations were planned and completed within a reasonable period of time. Specific performance generally is an inappropriate remedy in such circumstances. See Dover Shopping Center v. Cushman's Sons, Inc., 63 N.J. Super. at 394, 164 A.2d 785.

E.
For defendants' final point, we return to the question of counsel fees, this time in the context of the Law Division's award of such fees to Newport on its unsuccessful claim for delay damages. As we noted earlier, R. 4:42-9(a) states the general rule that "[n]o fee for legal services shall be allowed in the taxed costs or otherwise...." The Rule provides eight exceptions. R. 4:42-9(a)(1) to (8). It is undisputed that none of these exceptions is applicable in the present case. We add that R. 1:10-3 (formerly R. 1:10-5), which pertains to enforcement of litigant's rights, permits a court "in its discretion [to] make an allowance for counsel fees ... to a party accorded relief. ..." We have underscored the phrase "party accorded relief" because it clearly confines the right to award counsel fees to "successful movant[s]." Pressler, Current N.J. Court Rules, comment on R. 1:10-3 (1996). New Jersey's general prohibition against the award of counsel fees "was adopted to eliminate the abuses of the pre-1948 chancery practice of granting excessive fees to favored members of the bar." Satellite Gateway Communications v. Musi Dining Car Co., 110 N.J. 280, 285, 540 A.2d 1267 (1988). Although the original source rule was adopted in 1947 and has been modified on numerous occasions, its basic approach and philosophy remain the same. Ibid; see also State, Dep't of Envtl. Protection v. Ventron Corp., 94 N.J. 473, 504, 468 A.2d 150 (1983); Right to Choose v. Byrne, 91 N.J. 287, 316, 450 A.2d 925 (1982); Gerhardt v. Continental Ins. Cos., 48 N.J. at 301, 225 A.2d 328. We need not determine whether the courts have the inherent power to award fees, and if so, the parameters of such authority. See Red Devil Tools v. Tip Top Brush Co., 50 N.J. 563, 574-76, 236 A.2d 861 *406 (1967); Oliviero v. Porter Hayden Co., 241 N.J. Super. 381, 387, 575 A.2d 50 (App.Div. 1990). Assuming such authority exists, we find that no "injustice would occur if counsel fees [were] not awarded in this action." Satellite Gateway Communications v. Musi Dining Car Co., 110 N.J. at 288, 540 A.2d 1267. We thus adhere to the general rule barring the award of attorneys' fees.
Accordingly, the order granting counsel fees to Newport is reversed. The remaining judgment and orders appealed from are affirmed.